**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Daniel R. WILLIAMS, Defendant–Appellant.**

**No. 02–30209.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 10, 2003.

Filed Jan. 26, 2004.

Steven Jacobson, Federal Public Defender, Portland, OR, for the defendant-appellant.

Frank Noonan, Assistant United States Attorney, Portland, OR, for the plaintiff-appellee.

Before: GOODWIN, HUG, and BERZON, Circuit Judges.

BERZON, Circuit Judge:

Daniel Williams pled guilty, pursuant to an agreement with the United States Attorney, to one count of transmitting a

communication in interstate commerce containing a threat to injure the person of another, in violation of 18 U.S.C. § 875(c).[1] Williams was sentenced in June 2002 to fifteen months in prison—amounting to time served as he had been in federal custody since March 2000—and to three years of supervised release. As a condition of Williams' supervised release, the district judge required that he

take such psychotropic[2] and other medications prescribed for him by physicians treating his mental illness. He does not have the option not to take medication if it is prescribed by a physician treating him during the period of his supervised release. If he refuses to take prescribed medication, the probation officer shall bring that refusal to the Court's attention, so that the Court may choose whether to have the defendant appear to show cause why his supervision should not be revoked, or whether a bench warrant ought to issue in lieu thereof.[3]

We hold that this condition was improperly imposed and therefore vacate that aspect of the district court's sentence and remand for further proceedings.

## BACKGROUND

While Williams was a student at Portland Community College, according to the presentence report, one of his teachers reported to the campus police that Williams "several months earlier ... had expressed a desire to start a relationship with her. She declined his offer." What prompted the teacher's police report were two telephone calls from Williams asking her to discuss "what I talked to you about last term" and to meet him at a restaurant. A police officer advised the teacher to tell Williams, if he called again, that she wanted no further contact with him.

Nearly a year later, the teacher again alerted the campus police and reported harassing e-mails from Williams, providing

1. Unless otherwise indicated, all statutory references are to 18 U.S.C.

2. "Psychotropic" is defined as "acting on the mind." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 943 (10th ed.1999). For purposes of this opinion, we consider the broader term "psychotropic" medication to encompass only "antipsychotic" or "neuroleptic" drugs, "any of the powerful tranquilizers (as the phenothiazines) used esp. to treat psychosis and believed to act by blocking dopamine nervous receptors." *Id.* at 781.

3. This wording of the supervised release condition is from the district judge's oral judgment and differs from her written judgment, which appears to give the probation officer discretion to dictate Williams' medication intake: "As directed by the probation officer, the defendant shall take psychotropic medication, if medically approved, for the treatment of a mental or emotional disorder." We need not decide which version to review here, because our analysis does not depend on the specifics of either pronouncement. We do note that the difference in wording between the two orders could matter for other purposes, as the written order, but not the oral one, can be read to delegate to the probation officer the decision *whether* to require Williams to take prescribed psychotropic medication. *See United States v. Melendez–Santana,* 353 F.3d 93, 100–03 (1st Cir.2003) (district court impermissibly delegated to the probation officer the decision whether Melendez must participate in a drug treatment program). *Compare United States v. Rearden,* 349 F.3d 608, 619 (9th Cir.2003) ("Rearden agreed to a counseling condition, but maintains that a condition which defers to the probation office the ability to choose the type and extent of such treatment is too vague to stand. However, that's what probation officers do; they are mandated to supervise offenders and to enforce a sentencing court's terms and conditions of supervised release and probation."); *United States v. Fellows,* 157 F.3d 1197, 1204 (9th Cir.1998) ("The court cannot be expected to design and implement the particularities of a treatment program. That the court allowed a therapist to do so does not mean the court delegated its authority to impose conditions of release.").

copies of these messages. The record reflects that:

Between December 22, 1999 and February 9, 2000, defendant sent approximately 15 e-mails to [the teacher].... In general the e-mails were rambling and accusatory toward [her]. The first e-mail ... stated, in part, "for the record i never wanted a date with you. 10 to 1 i can find out where you live."

Other e-mails contained the following language:

"are you able to walk down the street alone without looking over you (sic) shoulder every time your (sic) hear the faintest noise?"

"if i have to kill you i am also willing to do that"[4]

"so i may be seeing you shortly, id (sic) say it would be time to start paying up before a crazed hooligan finds you on the way to your car or maybe even in the comfort of your own home."

"you must think that ending your life is something that ill (sic) think twice about"

"your (sic) still gonna pay up whether or not if i have to beat it out of you"

Because of these e-mails, Williams was charged with two state misdemeanor counts of stalking and harassment. Once he was transferred to the federal system, the district court found that Williams "suffers from some unnamed mental disease or defect, and that that is presently interfering with [his] ability to properly aid in [his] own defense."[5] Pursuant to § 4241(d),[6] Williams was sent to the Federal Medical Center (FMC) in Rochester, Minnesota. There, it was decided after an administrative hearing on October 11, 2001 that Williams was a danger to himself or others, gravely disabled, and should be involuntarily treated with psychotropic drugs in order to render him competent to stand trial. Although Williams appealed the decision, he complied with it and took the medication.

On November 13, 2001, after a telephonic hearing, the district court extended Williams' commitment and found that: "Defendant's constitutional right to decline drug treatment is outweighed by the government's interest in medicating him for the purpose of rendering him competent to stand trial."[7] The court noted that "the

---

4. This message was the basis of Williams' plea bargain.

5. The district court emphasized at this hearing that: "I'm not considering [comments about Williams' potential danger to the community] at this stage for purposes of competency."

6. Section 4241(d) reads as follows:

If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for treatment in a suitable facility—

(1) for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the trial to proceed; and

(2) for an additional reasonable period of time until—

(A) his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the trial to proceed; or

(B) the pending charges against him are disposed of according to law;

whichever is earlier.

7. Williams voluntarily dismissed his appeal to this court of the district court's November 2001 order.

government has agreed to vacate the administrative finding in this matter that Defendant is a danger to himself or to others and does not seek to justify the Involuntary Medication Report on that basis," adding that "in any event, this finding was obviously tainted by inadequate process before the hearings officer."

During the telephonic hearing, Dr. Christine Scronce, Director of Forensics at the FMC, testified as follows concerning Williams' dangerousness:

Williams' Counsel: Now there's no concern among either you or the other doctors about Mr. Williams being able to follow the rules at . . . the hospital?

Dr. Scronce: Oh, no. Not at all.

Q: He is on an open ward and holds a job, and nobody's concerned that he's dangerous in that context?

A: That's correct.

The district court's November 2001 order added that "[d]efendant has experienced some lethargy, blurred vision, and dry mouth. He fears tremors, facial paralysis, and other side effects may follow, and he is concerned all of the side effects may be long term." Based on Williams' treating psychiatrist's testimony, the court concluded that the medication would cause Williams "only minimal, temporary side effects. The Court finds the medication, therefore, is 'medically appropriate.'"

In February 2002, Dr. Scronce issued a Forensic Evaluation/Discharge Summary. Dr. Scronce noted that her examination of Williams had focused on "what impact these present symptoms may have on the abilities that would be necessary for Mr. Williams to understand and participate in the proceedings." She stated that, while Williams continued to "suffer from a mental disease or defect, it does not presently render him unable to understand the nature and consequences of the proceedings against him, or to assist properly in his defense." Williams was returned to federal custody in Oregon at the end of February 2002. With the termination of Williams' commitment at the FMC, the district court's involuntary medication order also expired. At sentencing in June 2002, Williams stated that he had continued voluntarily to take his medication.

Williams' presentence report discussed his criminal history. After reaching the age of majority, Williams was convicted in February 1999 of misdemeanors (harassment, disorderly conduct, attempted assault, and assault) arising out of an alcohol-fueled incident at Portland State University. Williams' March 1999 telephone contact with his teacher violated a condition of his ensuing probation, that Williams not contact any employee of an Oregon institution of higher education. In April 1999, Williams tested positive for marijuana and failed to complete a psychological evaluation, both violations of probation. A substance abuse evaluation indicated that Williams was cocaine and methamphetamine dependent. Subsequent probation violations included using marijuana, failing to participate in drug treatment, and absconding from supervision.

Sometime in January 2000, at approximately the same time he sent the threatening e-mails to his teacher, Williams was hospitalized for three days at St. Luke's in San Francisco. He refused treatment. This hospitalization followed what Williams calls a dispute but what the presentence report records as an arrest for "Vandalism, Throwing Projectiles at a Vehicle, and Threatening with a Weapon." There were criminal charges deriving from this incident, later dismissed.

In the present case, after reaching a plea agreement, the parties made submissions to the court regarding sentencing. An addendum to the presentence report noted an unresolved objection to the pro-

bation officer's recommendation that Williams be required to take medication. In rejecting defense counsel's position favoring voluntary compliance, the probation officer wrote: "It is notable that after defendant began taking medications at FMC Rochester, his condition began to improve. Defendant was not on medication when he committed his crimes. If, as defense counsel states, defendant had no objections to undergoing mental health treatment, then he should have no objections to submitting to all aspects of treatment, including taking medication."

Before sentencing, the parties and the probation office agreed not to seek an upward departure based on conduct evidencing an intent to carry out Williams' e-mail threat. At the sentencing hearing, the government did not contend that Williams is dangerous. No medical evidence was introduced indicating that he is currently dangerous if unmedicated or linking his crimes to his failure to take psychotropic medication.

In calculating Williams' sentence, the district judge applied an enhancement to reflect Williams' uttering of more than two threats, offset by a reduction for his acceptance of responsibility. On the issue of medication, the judge began by rejecting a downward departure for diminished capacity:

> [T]he question is whether the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved a serious threat of violence. The content of Mr. Williams' messages threatened violence. Was that a serious threat? In a person who has a delusional mental illness that is untreated, I think it is a serious threat in the sense that the defendant is not able to control his conduct while delusional. So it is, in my view of thinking, really interconnected to this whole issue of untreated mental illness.

The court concluded concerning the proposed departure that: "[I]n my view of the facts, his particular mental illness and the risk he can pose is much greater when unmedicated than when he is medicated. It seems to me a poor exercise of sentencing discretion to reduce his sentence because they [sic] were in the community in an untreated state and causing a greater risk because of that state. . . . So while that's not an actual finding, I'm simply offering the observation, because I conclude he's not qualified for the departure."

In arguing against a mandatory medication condition, Williams' counsel relied upon the liberty and due process interests recognized by the Supreme Court in its involuntary medication decisions. Counsel added that no showing had been made of Williams' dangerousness to justify mandatory medication, noted Williams' acceptance of responsibility and assurance of future good behavior, and suggested the following way to proceed:

> [T]he Court [should] impose conditions, including mental health treatment; and . . . if it appears that Mr. Williams is not able to perform in the community, when that time comes, without such medication, then we would be in a posture to come back before the Court. But I think there is a realization on his part at this time that his behavior was way beyond the bounds, that he's attempted to apologize for it, and he's attempted to assure the Court that he will not do this sort of thing again. My suggestion . . . is that we give him a chance to show that and prove it, and allow him to voluntarily continue with treatment rather than have it be forced.

The court then heard from the defendant himself, who stated that he was voluntarily taking Haldol, an antipsychotic medication, which made him feel "[l]ousy, tired, lousy. Like medicated, kind of." The court asked whether, if Williams had a

choice, he would stop taking the medication. He answered: "Probably not right away, but eventually I would." Williams went on to declare that he would not sign a "permission slip to be medicated with an antipsychotic medication." He expressed his concern that "once I get out there, whoever I talk to is not going to be willing to listen—just like what happened at [FMC] Rochester, not be willing to listen to anything I have to say about anything, and simply putting me on medication. If I don't like it, tough."

The district court, without addressing counsel's constitutional arguments or any potentially less restrictive conditions, decided that the mandatory medication condition was "rationally related to supervising [Williams] in the community." This appeal followed. As of October 2002, when his opening brief was filed, Williams was "in compliance with conditions of his supervised release."

## DISCUSSION

### I. *Ripeness*

■ The government, citing *United States v. Linares*, 921 F.2d 841 (9th Cir. 1990), and *United States v. Montenegro–Rojo*, 908 F.2d 425 (9th Cir.1990), argues that Williams' case is not ripe: "There is no evidence presently before the court to indicate that medications have been prescribed, refused, or that the court has taken any action with respect to the defendant's supervised release."

The passage cited by the government from *Montenegro–Rojo* concerns possible future revocation of supervised release, not the conditions of that release. The court stated:

> Appellant also argues that supervised release can amount to incarceration.... Yet if, as we hold, [the statute] itself provides authorization for periods of supervised release in excess of the maximum imprisonment terms of specific criminal statutes, it also implicitly provides authorization for any such supervised release time spent in jail. In any event, since this argument describes a hypothetical situation that has not yet occurred in appellant's case, he lacks standing to argue it now.

908 F.2d at 432 n. 9.

*Linares* cited this footnote in considering an appellant's argument that because his sentence included "a one year term of supervised release in addition to his sentence of six months imprisonment, the sentence renders the appellant amenable to imprisonment for more than one year if the district court revokes the supervised release." 921 F.2d at 843. The court concluded that "[t]he issue Linares raises is not ripe for review [because] *Linares is not challenging the imposition of supervised release; he is challenging the potential revocation of his supervised release and the effect it would have upon his ultimate punishment.* We conclude that he lacks standing to challenge hypothetically a revocation that may never occur." *Id.* (emphasis added). Thus, both *Montenegro–Rojo* and *Linares* concern only a hypothetical future revocation of supervised release and have no application here, as Williams is challenging a condition of his release imposed at the time of sentencing.

This court has stated clearly that "a defendant may challenge the legality of a supervised release condition[by] direct appeal." *United States v. Gross*, 307 F.3d 1043, 1044 (9th Cir.2002). While the government suggests that the issue before us cannot be ripe until Williams refuses to take prescribed medicine, we have not required violation of a specified supervised release condition to permit appellate review. *See, e.g., United States v. Johnson*, 998 F.2d 696 (9th Cir.1993) (reviewing a condition requiring the appellant to participate in mental health counseling). In ad-

dition, requiring Williams to refuse to take medication in order to be accorded judicial review could, unacceptably, imperil his health.

For these reasons, the government's ripeness argument fails.

## II. *The Supervised Release Statute*

■ Pursuant to the Sentencing Guidelines, supervised release was mandatory in this case because Williams' sentence exceeded one year. *See* U.S. Sentencing Guidelines Manual § 5D1.1(a). Exactly what discretionary conditions are imposed on supervised release is left to the sentencing court, which has at its disposal all of the evidence, its own impressions of a defendant, and wide latitude to design supervised release conditions. *See United States v. Bee*, 162 F.3d 1232, 1234 (9th Cir.1998) ("The district court has broad discretion in setting conditions of supervised release, including restrictions that infringe on fundamental rights."); *United States v. Bolinger*, 940 F.2d 478, 480 (9th Cir.1991). We review supervised release conditions deferentially, under the abuse of discretion standard. *United States v. T.M.*, 330 F.3d 1235, 1240 n. 2 (9th Cir. 2003).

■ The district court's supervised release conditions are governed by 18 U.S.C. § 3583. Section 3583(c) states that: "The court ... if a term of supervised release is to be included, in determining the length of the term and the conditions of supervised release, shall consider the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)." Relevant here among these factors are the first four: "the nature and

circumstances of the offense and the history and characteristics of the defendant;" "afford[ing] adequate deterrence to criminal conduct;" "protect[ing] the public from further crimes of the defendant;" and "provid[ing] the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D). "Conditions of supervised release must relate to these purposes, but may be unrelated to one or more of [them], so long as they are sufficiently related to the others." *Bee*, 162 F.3d at 1235(quotation marks and citations omitted).

In addition to enumerating mandatory conditions of supervised release, section 3583(d) provides that:

> The court may order, as a further condition of supervised release, to the extent that such condition—
>
> (1) is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);
>
> (2) *involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D);* and
>
> (3) is consistent with any pertinent policy statements issued by the Sentencing Commission ...
>
> any condition set forth as a discretionary condition of probation in section 3563(b)(1) through (b)(10) and (b)(12) through (b)(20), and any other condition it considers to be appropriate.

(emphasis added).[8] The supervised release condition at issue is therefore valid under the statute if pursuant to section

---

**8.** Section 3563(b)(9) authorizes requiring a defendant to "undergo available medical, psychiatric, or psychological treatment, including treatment for drug or alcohol dependency, as specified by the court, and remain in a specified institution if required for that purpose."

*See also United States v. Lopez*, 258 F.3d 1053, 1056 (9th Cir.2001) (noting that Sentencing Guidelines " § 5D1.3(d)(5) specifically recommends that a special condition of mental health program participation be imposed: 'If the court has reason to believe that the defen-

3553 it properly relates to Williams' "history and characteristics;" deterring and protecting the public from further crimes by Williams; or meeting Williams' medical needs; *and* is properly tailored under section 3583(d)(2). *See T.M.*, 330 F.3d at 1240 ("Even if [supervised release] conditions meet the above requirements [of deterrence, protection of the public, or rehabilitation of the offender], they still can involve 'no greater deprivation of liberty than is reasonably necessary for the purposes' of supervised release.").

■ The district court did not apply the second, "no greater deprivation of liberty than is reasonably necessary," standard. Instead, the court "thought the standard was the conditions I impose have to be rationally related to the offense and assuring that the defendant remain crime-free in the community when he is on supervision." The district court thus applied the wrong standard in imposing the mandatory medication condition.

The failure to tailor the condition imposed to the liberty interest at stake as required by § 3583(d)(2) is of particular importance in this case, as the liberty interest in avoiding mandatory use of antipsychotic medication is one that the United States Supreme Court has recognized as being of unusual significance in recent years, as we discuss in the next section.

Given the high magnitude of this liberty interest, the absence at sentencing of any explicit medically-based finding under § 3583(d)(2) compels us to remand for reconsideration under the proper statutory standard and on an adequate record.[9]

**A. Liberty Interest in Refusing Antipsychotic Medication**

■ The Supreme Court has thrice recognized a "liberty interest in freedom from unwanted antipsychotic drugs." *Riggins v. Nevada*, 504 U.S. 127, 137, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992). Both convicted prisoners and pretrial detainees "possess[ ] a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper*, 494 U.S. 210, 221–22, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990); *see also Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 2183, 156 L.Ed.2d 197 (2003) ("In *Harper*, this Court recognized that an individual has a 'significant' constitutionally protected 'liberty interest' in 'avoiding the unwanted administration of antipsychotic drugs.' ") (citation omitted); *Kulas v. Valdez*, 159 F.3d 453, 455–56 (9th Cir.1998).

The significant due process liberty interest in avoiding mandatory administration of antipsychotic medication[10] is grounded

dant is in need of psychological or psychiatric treatment.' ").

**9.** As we do not know whether the same mandatory condition would be imposed under the correct standard, there is no reason to address the question whether the statutory scheme fully protects Williams' constitutional liberty interest in avoiding unwanted antipsychotic medication while on supervised release, and we do not do so. *See Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such

adjudication is unavoidable."), *quoted in Dep't of Commerce v. United States House of Representatives*, 525 U.S. 316, 343, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999).

**10.** *Harper* involved the forcible injection of antipsychotic drugs to convicted prisoners. 494 U.S. at 229, 110 S.Ct. 1028. Use of physical force to administer unwanted drugs is more intrusive, certainly, than coercing ingestion through the threat of incarceration should the defendant fail to comply with a compulsory order to take the medication. The recognition of a significant liberty interest in *Harper* and its progeny does not depend, however, upon the means used to compel administration of the drugs.

in two considerations. The Supreme Court has emphasized these aspects of antipsychotic medication to demonstrate why unwanted administrations are a "particularly severe" invasion of liberty. *See Riggins*, 504 U.S. at 134, 112 S.Ct. 1810.

First, the drugs "tinker[ ] with the mental processes," *Mackey v. Procunier*, 477 F.2d 877, 878 (9th Cir.1973), affecting cognition, concentration, behavior, and demeanor. While the resulting personality change is intended to, and often does, eliminate undesirable behaviors, that change also, if unwanted, interferes with a person's self-autonomy, and can impair his or her ability to function in particular contexts. *See Riggins*, 504 U.S. at 137, 112 S.Ct. 1810; *id.* at 142–44, 112 S.Ct. 1810 (Kennedy, J., concurring); *see also Sell*, 123 S.Ct. at 2184.

Second, as *Harper* recognized and the Supreme Court reiterated in *Riggins:*

> While the therapeutic benefits of antipsychotic drugs are well documented, it is also true that the drugs can have serious, even fatal, side effects.... [S]ide effects include akathesia (motor restlessness, often characterized by an inability to sit still); neuroleptic malignant syndrome (a relatively rare condition which can lead to death from cardiac dysfunction); and tardive dyskinesia.... Tardive dyskinesia is a neurological disorder, irreversible in some cases, that is characterized by involuntary, uncontrollable movements of various muscles, especially around the face.... A fair reading of the evidence ... suggests that the proportion of patients treated with antipsychotic drugs who exhibit the symptoms of tardive dyskinesia ranges from 10% to 25%.

*Harper*, 494 U.S. at 229–30, 110 S.Ct. 1028; [11] *see also Riggins*, 504 U.S. at 134, 112 S.Ct. 1810 (quoting this passage from *Harper*); *In re Qawi*, 32 Cal.4th 1, 7 Cal.Rptr.3d 780, 81 P.3d 224, 231 (2004) (noting that antipsychotics "have been the cause of considerable [reversible and potentially permanent] side effects.... On rare occasions use of these drugs has caused sudden death."); *Kulas*, 159 F.3d at 455–56 (noting *"the serious side effects* that such medication can have on mind and personality, physical condition and life itself"* (emphasis added)); Michael L. Perlin, MENTAL DISABILITY LAW 370–71 (1999) (de-

---

*Harper* identified that interest as "avoiding the *unwanted* administration of antipsychotic drugs," *id.* at 221, 110 S.Ct. 1028 (emphasis added); *see also id.* at 213, 110 S.Ct. 1028 (framing the question presented as being when "the State may treat a mentally ill prisoner with antipsychotic drugs *against his will"*) (emphasis added). That terminology applies equally to all forms of coercion. In describing Harper's interest in more detail, the Court relied only in passing on the forcible nature of the drugs' administration, commenting primarily on the side effects that result from "alter[ing] the chemical balance in a patient's brain." *Id.* at 229, 110 S.Ct. 1028. Those side effects are the same, of course, whether the medication is taken involuntarily under threat of adverse consequences for failing to do so or as a result of forcible administration. *Sell* confirmed this reading of *Harper* by treating "a court order to the defendant backed by the contempt power" as a form of involuntary medication, albeit one that is a "less intrusive means for administering the drugs" as compared with "more intrusive methods." 123 S.Ct. at 2185.

**11.** *See also Harper*, 494 U.S. at 240–41, 110 S.Ct. 1028 (Stevens, J., concurring in part and dissenting in part) ("The Washington Supreme Court properly equated the intrusiveness of this mind-altering drug treatment with electroconvulsive therapy or psychosurgery. It agreed with the Supreme Judicial Court of Massachusetts' determination that the drugs have a profound effect on a person's thought processes and a well-established likelihood of severe and irreversible adverse side effects, and that they therefore should be treated in the same manner we would treat psychosurgery or electroconvulsive therapy.") (quotation marks and citations omitted).

tailing "toxic effects" of antipsychotic drugs); Erica Goode, *Leading Drugs for Psychosis Come Under New Scrutiny*, N.Y. Times, May 20, 2003, at A1 (describing "the stiffness, trembling and other Parkinson's-like symptoms commonly seen in patients taking older antipsychotics like Haldol").

Both these types of effects are as likely to impair individuals on supervised release as they are to affect prisoners and pretrial detainees. As antipsychotic medication has a special status, an order compelling a person to take antipsychotic medication is an especially grave infringement of liberty, and a thorough inquiry is required before a court may issue it.

*Harper* held, for example, that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, *if* the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." 494 U.S. at 227, 110 S.Ct. 1028(emphasis added). While he was in prison, therefore, Williams could not have been forced to take medication absent "a finding of over-riding justification and a determination of medical appropriateness." *Riggins*, 504 U.S. at 135, 112 S.Ct. 1810 (citing *Harper*).[12] Replacing Williams' incarceration with a court-backed threat of renewed incarceration

should he violate an order to take prescribed psychotropic medication does not eliminate the coercive nature of the medication requirement or otherwise lessen the impairment of the recognized liberty interest in being free of unwanted antipsychotic medication.

In the past, we have held that a sentencing judge is not required to "articulate on the record at sentencing the reasons for imposing each [supervised release] condition." *United States v. Rearden*, 349 F.3d 608, 619 (9th Cir.2003). We now hold, however, that *Harper* compels the conclusion that an order requiring Williams to take antipsychotic drugs is an unusually serious infringement of liberty that calls for more thorough consideration and justification than the conditions of supervised release this court has previously approved.[13] Just as treatment with antipsychotic medication "imposes a significant additional burden on ... [a mentally disordered offender's] liberty interest," beyond that implicated by mandatory participation in noninvasive mental health treatment, because of the "potentially serious side effects," *Qawi*, 81 P.3d at 231 n. 4 (citing *Sell*), so such treatment imposes an invasive burden on liberty requiring especially careful scrutiny under § 3583(d)(2).

To recognize a strong constitutionally-based liberty interest in avoiding unwant-

12. Additionally, Williams could not have been civilly committed in Oregon, even after a showing by clear and convincing evidence that he was mentally ill, if a court found that he was "willing and able to participate in treatment on a voluntary basis; and ... will probably do so." Or.Rev.Stat. § 426.130(1)(b)(A).

13. *See, e.g., Rearden*, 349 F.3d at 620–21 (barring access to the Internet without prior approval of a probation officer); *Bee*, 162 F.3d at 1234–35 (infringing upon free speech interests by prohibiting the possession of sexually stimulating or sexually oriented material); *id.* at 1235–36 (prohibition of unapproved con-

tact with children and loitering in places primarily used by children, infringing on liberty interests); *Bolinger*, 940 F.2d at 480 (condition infringing on associational interests by barring participation in motorcycle clubs); *United States v. Romero*, 676 F.2d 406, 407 (9th Cir.1982) (restriction infringing on associational interests by barring interaction with persons involved with drugs); *United States v. Lowe*, 654 F.2d 562, 567–68 (9th Cir.1981) (restriction infringing on First Amendment interests by limiting protestors' access to a submarine base); *United States v. Furukawa*, 596 F.2d 921, 923 (9th Cir.1979) (instruction to associate with only law-abiding individuals).

ed antipsychotic medication is not, of course, to suggest that an order requiring such medication cannot be a valid requirement of supervised release in appropriate circumstances. The supervised release statute, however, permits only a condition that "involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D)." 18 U.S.C. § 3583(d)(2). Where, as here, the liberty interest is one so weighty that even with respect to prisoners it can be overcome only with "a finding of overriding justification and a determination of medical appropriateness," *Riggins,* 504 U.S. at 135, 112 S.Ct. 1810 (citing *Harper*), the statutory standard cannot be met unless the district judge makes an explicit, specific finding under § 3583(d)(2).

### B.  *Need for Medical Evidence*

■ We also conclude that the unique nature of involuntary antipsychotic medication and the attendant liberty interest require that imposition of such a condition occur only on a medically-informed record. While *Harper* did not mandate an exact procedure for medical input into an involuntary antipsychotic medication decision in prison—and nor do we for supervised release—the Court did emphasize the importance of independent medical decision-making and noted the available opportunity for the prisoner to challenge medical evidence. 494 U.S. at 233–35, 110 S.Ct. 1028. Our requirement that medically-informed records be developed before mandatory antipsychotic medication conditions are imposed similarly encompasses an independent and timely evaluation of the supervise by a medical professional, including attention to the type of drugs proposed, their dosage, and the expected du-

ration of a person's exposure, as well as an opportunity for the supervise to challenge the evaluation and offer his or her own medical evidence in response. The evaluation should be tailored to address the requirements of the supervised release statute.

■ In Williams' case, the district court was obliged to make findings on a medically-informed record to support its mandatory medication condition of supervised release. *See id.* at 232–33, 110 S.Ct. 1028 (stressing the importance of medical expertise regarding the justification for compelled medication); *id.* at 233, 110 S.Ct. 1028 ("The trial court made specific findings that respondent has a history of assaultive behavior *which his doctors attribute to his mental disease.*") (emphasis added); *Felce v. Fiedler,* 974 F.2d 1484, 1498 (7th Cir.1992) ("The parole plan, while devised with medical *advice,* was not subject to independent medical evaluation. Therefore, there was no safeguard against the imposition of a plan [including mandatory antipsychotic medication] that was not justified medically."). The district court's failure to make such medically-informed findings was an abuse of discretion. *See Johnson,* 998 F.2d at 697.

Although the presentence report stated, in an addendum addressing "defense counsel's unresolved objections," that Williams was not "on medication when he committed his crimes," there was *no* medical evidence (1) indicating that Williams would not have committed the crimes had he been medicated, or (2) regarding Williams' mental condition at or around the time of sentencing, in general or with particular regard to the need for psychotropic medication to prevent criminal behavior while on supervised release, the reason the district court indicated for the medication condition.[14]

---

**14.** We harbor no disagreement with the district court's decision to adopt the presentence report as its own findings and conclusions

"[o]ther than those paragraphs ... amended, clarified, adjusted, or on which no finding is necessary." It was the court's prerogative to

The *only* medically-based finding of a need for Williams' medication based on dangerousness was vacated in November 2001 with the government's agreement, after the district court expressed concern about procedural defects in the administrative hearing that produced the finding. The ensuing involuntary medication order was directed only at establishing Williams' competence to stand trial, rather than at addressing any risk to the public. These are not interchangeable inquiries. *See Sell*, 123 S.Ct. at 2187("Whether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions are matters important in determining the permissibility of medication to restore competence but not necessarily relevant when dangerousness is primarily at issue." (citation omitted)).

In sum, before a mandatory medication condition can be imposed at sentencing, the district court must make on-the-record, medically-grounded findings that court-ordered medication is necessary to accomplish one or more of the factors list-ed in § 3583(d)(1).[15] Also, the court must make an explicit finding on the record that the condition "involves no greater deprivation of liberty than is reasonably necessary." *See* 18 U.S.C. § 3583(d)(2).

## CONCLUSION

The district court did not follow 18 U.S.C. § 3583(d)(2) when it imposed Williams' supervised release condition of mandatory medication. As a result, we vacate the condition and remand for further proceedings consistent with this opinion.

**VACATED IN PART AND REMANDED.**

---

find "all uncontroverted facts contained in the Presentence Report to be true and accurate." *See United States v. Navarro,* 979 F.2d 786, 789 (9th Cir.1992) ("The court may adopt the factual findings of the presentence report. It may not, however, adopt conclusory statements unsupported by facts or the Guidelines." (citations omitted)). Our objection is to the absence in the record as a whole, *including* the presentence report, of *any* medical evaluation focused on the need for mandatory medication.

**15.** As far as we can determine from the record, the statutory sentencing purposes upon which the district court relied in imposing the mandatory medication requirement were deterring and protecting the public from further crimes by Williams while he is on supervised release. *See* 18 U.S.C. §§ 3553(a)(2)(B), (a)(2)(C). The court stated that "the conditions I impose have to be rationally related to the offense and *assuring that the defendant remain crime-free in the community* when he is on supervision." (emphasis added). We note that the third purpose recognized in § 3583(d)(2), providing Williams' "needed ... medical care ... in the most effective manner" under § 3553(a)(2)(D), is almost surely not sufficiently overriding, standing alone, to accord with *Harper.*