[No. A130605. First Dist., Div. Two. Jan. 28, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
NICHOLAS DANIEL PETTY, Defendant and Appellant.

## COUNSEL

Kathryn Seligman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Christopher J. Wei, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RICHMAN, J.**—After pleading guilty to felony grand theft (Pen. Code, § 487, subd. (a)),[1] Nicholas Daniel Petty challenges on appeal two of the conditions of his probation, namely that he take antipsychotic medications at the direction of his mental health worker and that he stay at least 50 yards from the victim's home. He also challenges the legality of a stay-away order prohibiting him from coming within 100 yards of the victim or her daughter.

Resolution of the first question requires us to consider the applicability of our prior decision in *In re Luis F.* (2009) 177 Cal.App.4th 176 [99 Cal.Rptr.3d 174] (*Luis F.*) to an adult probationer. In *Luis F.* we upheld the juvenile court's power to require psychotropic medication as a condition of juvenile probation. But in the present case we conclude the medication condition of probation must be stricken due to lack of a medically informed showing that the condition is reasonably related to defendant's crime or future criminality. We affirm the 50-yard restriction on defendant's approach to the victim's home and the stay-away order, as modified.

## FACTS

In August 2010 the victim and her husband returned home to Novato from separate business trips to find about 10 items of jewelry worth about $9,500 missing from their bedroom. While she and her husband were away, the victim's daughter hosted a party at the residence without her parents' permission. The guests at the party included defendant, age 19, who eventually confessed to the theft.

About a month after the theft, defendant and his mother showed up at the victim's home. Defendant told the victim he had taken the jewelry when he was drunk and could not explain why he took it. He claimed he had developed a guilty conscience in the days following the theft and had tried to return the jewelry by placing it in a blue envelope, along with a note of apology, and putting it under the victim's fence at 3:00 a.m. He came back to check the following day and found the jewelry was gone, so he thought the victim had found it.

In a later phone call with the victim, defendant admitted he had taken the jewelry to pay off a drug debt. He also admitted to the police he was addicted to OxyContin. On the phone he told the victim he had placed the jewelry in a Ziploc bag and put it under the fence.

---

[1] Statutory citations unless otherwise designated are to the Penal Code.

Defendant entered a guilty plea before the preliminary examination. Imposition of sentence was suspended and he was placed on probation for three years.

## DISCUSSION

The probation report recommended, among many other conditions, that defendant stay 100 yards away from the victim's residence and that he "comply with all directions of his/her mental health worker, including taking medications as directed." Defendant objected to those two conditions. The court modified the stay-away condition to 50 yards from the victim's residence and modified the medication condition to make it "subject to court review upon the defendant's timely objection." The court also issued a protective order requiring defendant to stay at least 50 yards from the victim's residence and 100 yards from the victim and her daughter.

Defendant challenges both the medication and stay-away conditions of probation and also claims the court had no authority to issue the protective order.

*Medication condition*

Defendant has a long history of mental health issues. By his own account, he had been on medication for attention deficit hyperactivity disorder since age seven and had been taking sleep aids since age 14. He began seeing a therapist and a behavioral pediatrician at approximately age 10. He was diagnosed with bipolar disorder and posttraumatic stress disorder when he was 17. Defendant's mother said he had recently been "stabilized" with "pretty heavy-duty medications." Defendant told the probation officer he had been taking Seroquel and clonazepam at the time of his arrest, but his medications were changed to Thorazine and lithium when he went to jail. His stepmother thought he might be "over-medicated" and should be taken off all medications to have his mental status reevaluated. She also worried about the interaction between his medications and the alcohol and illicit drugs he consumed.

The probation report recommended that defendant be ordered to stay on his medications because "without appropriate treatment, his ability to comply with probation conditions may be compromised." The prosecutor argued mental health medication was required for defendant's rehabilitation, pointing out that the defense had drawn attention to his mental health problems in arguing for leniency during plea negotiations. ·

The court concluded, "[I]t seems to me fairly clear that a part of the defendant's criminality relates to his mental health." The court appeared to

attach significance to defense counsel's earlier reliance on defendant's mental health problems in plea negotiations.

Defendant contends the medication condition violates *People v. Lent* (1975) 15 Cal.3d 481, 486 [124 Cal.Rptr. 905, 541 P.2d 545], in that it was not "reasonably related to the crime of which the defendant was convicted or to future criminality." He further claims that, because it restricts his exercise of constitutional rights, it needed to be narrowly drawn and reasonably related to the compelling state interest in rehabilitating defendant and protecting public safety. (*People v. O'Neil* (2008) 165 Cal.App.4th 1351, 1356 [81 Cal.Rptr.3d 878].)

Defendant relies largely on *U.S. v. Williams* (9th Cir. 2004) 356 F.3d 1045, 1053–1057 (*Williams*), which established certain procedural requirements before a court could impose a condition of supervised release requiring the defendant to take antipsychotic medication.[2] The Attorney General opposes defendant's position based on our prior decision in *Luis F., supra,* 177 Cal.App.4th 176. Defendant has the better argument.

In *Luis F., supra,* 177 Cal.App.4th 176, we held a juvenile offender could be ordered as a condition of probation to continue to take medically effective psychotropic drugs which had been prescribed by his doctor and which he had been taking voluntarily prior to being declared a ward. (*Id.* at pp. 192–193.) In so holding we reviewed a number of United States Supreme Court cases dealing with forced administration of antipsychotic drugs in which a due process right to refuse antipsychotic medication was recognized. (*Luis F., supra,* 177 Cal.App.4th at p. 183, fn. 6, discussing *Washington v. Harper* (1990) 494 U.S. 210, 221–222, 227 [108 L.Ed.2d 178, 110 S.Ct. 1028] [forcible administration to prison inmate], *Riggins v. Nevada* (1992) 504 U.S. 127, 133–135 [118 L.Ed.2d 479, 112 S.Ct. 1810] [forcible administration during trial] and *Sell v. United States* (2003) 539 U.S. 166, 179 [156 L.Ed.2d 197, 123 S.Ct. 2174] [forcible administration to render a defendant competent for trial]; see *Carter v. Superior Court* (2006) 141 Cal.App.4th 992 [46 Cal.Rptr.3d 507] [forcible administration to render defendant competent for trial]; *U.S. v. Ruiz-Gaxiola* (9th Cir. 2010) 623 F.3d 684, 687 [same].)

Both this case and *Luis F.* are clearly distinguishable from the forced administration cases.

In *Luis F.* we also discussed at some length and distinguished *Williams, supra,* 356 F.3d 1045. *Williams* involved a "college student who sent

---

[2] *Williams*'s holding is not binding on us, although we give it respectful consideration on federal constitutional issues. (*People v. Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129].)

threatening e-mails to one of his teachers. Initially found incompetent to stand trial, Williams was hospitalized and involuntarily medicated with antipsychotic drugs. Once he regained his competency he continued taking the antipsychotic medications on a voluntary basis, although the record shows that they caused him to experience ' "lethargy, blurred vision, and dry mouth," ' and they made him feel 'lousy' and 'medicated.' ([*Williams, supra,*] 356 F.3d at pp. 1049–1050.) In light of these side effects, Williams objected at sentencing to a continuing medication condition, indicating that at some point in the future he probably would want to discontinue the medication. (*Id.* at pp. 1050–1051.)

"The judge nevertheless imposed a condition of supervised release requiring Williams to take all ' "psychotropic and other medications prescribed for him by physicians treating his mental illness." ' (*Williams, supra*, 356 F.3d at p. 1047, fn. omitted; see *id.* at p. 1047, fn. 3.) The propriety of this condition was appealed to the Ninth Circuit.

"Under the federal statutes, a condition of supervised release ordinarily must be 'reasonably related' to one or more of the statutory factors deemed to advance the goals of supervised release. (18 U.S.C. § 3583(d)(1); see also 18 U.S.C. § 3553(a)(1), (2)(B), (2)(C) & (2)(D) [specifying factors relevant to supervised release].) In light of the significant liberty interest at stake in the context of coerced psychotropic medication, however, *Williams* appears to demand a stronger nexus between the need for medication and the goals of supervised release, requiring that the medication condition be 'necessary' for the achievement of those goals, not simply ' "reasonably related" ' to them. (*Williams, supra*, 356 F.3d at pp. 1052–1053, 1057; see also *U.S. v. Weber* (9th Cir. 2006) 451 F.3d 552, 561, 568 (*Weber*) [a condition implicating a 'sufficiently weighty' liberty interest must be 'reasonably necessary' to the underlying goals of supervised release].)

"Additionally, while acknowledging that imposition of most terms of supervised release do not require the court to articulate reasons on the record, *Williams* concluded that requiring a defendant to take antipsychotic medications as a condition of supervised release requires an express finding that the condition ' "involves no greater deprivation of liberty than is reasonably necessary for the purposes" ' underlying the supervised release statute. (*Williams, supra*, 356 F.3d at pp. 1053, 1056, quoting 18 U.S.C. § 3583(d)(2).) A condition of supervised release must meet that standard in all federal cases under 18 United States Code section 3583(d)(2), but the additional requirement of on-the-record compliance with that statutory provision appears to stem from the court's belief that the Supreme Court's forcible administration cases dictate such a result. ([*Williams, supra,*] 356 F.3d at p. 1055.)

"Finally, *Williams* required the sentencing court to develop a 'medically-informed' record before imposing a medication requirement. (*Williams, supra,* 356 F.3d at pp. 1056–1057.) The court held that 'before a mandatory medication condition can be imposed at sentencing, the district court must make on-the-record, medically-grounded findings that court-ordered medication is necessary to accomplish one or more of the [factors relevant to supervised release] . . . [and] must make an explicit finding on the record that the condition "involves no greater deprivation of liberty than is reasonably necessary." ' (*Id.* at p. 1057, quoting 18 U.S.C. § 3583(d)(2); see also *Weber, supra,* 451 F.3d at pp. 568–569 [requiring similar findings to support penile plethysmograph testing as a condition of supervised release];[3] *U.S. v. Cope* (9th Cir. 2008) 527 F.3d 944, 955 & fn. 5, cert. den. *sub nom. Cope v. U.S.* (2008) [555 U.S. 933 [172 L.Ed.2d 232, 129 S.Ct. 321]] (*Cope*) [explaining that *Williams* applies to any condition of supervised release that ' "implicates a particularly significant liberty interest of the defendant," ' and this would include involuntary chemical castration, such as by use of Depo-Provera].)" (*Luis F., supra,* 177 Cal.App.4th at pp. 185–186, fn. omitted.) Although there was no issue of physically forced medication, *Williams* considered a requirement of antipsychotic medication during supervised release to be sufficiently "coercive" to require a stronger showing than other, less invasive conditions of supervised release. (*Williams, supra,* 356 F.3d at pp. 1053, fn. 10 & 1055.)

We did not adopt in *Luis F.* the same procedural strictures outlined in *Williams* for various reasons, not the least of which was that we were dealing with a juvenile, not an adult offender. We relied upon the particularly broad discretion of a juvenile court in devising appropriate conditions of probation for a minor, including that Welfare and Institutions Code section 727, subdivision (a), specifically authorizes a juvenile court to make orders for "medical treatment" of wards. (See *Luis F., supra,* 177 Cal.App.4th at pp. 188–189.)

Luis had been hospitalized for two weeks with suicidal tendencies approximately three months before he committed his crime. (*Luis F., supra,* 177 Cal.App.4th at pp. 179, 190.) His school performance had improved after he started taking the medications. (*Id.* at pp. 180, 190.) The medications were also reported to alleviate his sense of alienation from his peers and to promote his social adjustment. (*Id.* at p. 191.) Thus, there were good reasons for the court, acting as *parens patriae,* to condition probation on his continued medication in the hope and expectation it would help to deter him from future criminality. (*Id.* at pp. 188–191; see generally *In re Frank V.* (1991) 233 Cal.App.3d 1232, 1242–1243 [285 Cal.Rptr. 16].)

---

[3] Penile plethysmograph testing involves attaching a pressure-sensitive device to a man's penis to determine his level of arousal when exposed to various sexually stimulating visual or auditory inputs. (*Weber, supra,* 451 F.3d at pp. 554, 562.)

But the case now before us is much closer to *Williams* than to *Luis F*. We agree with defendant that adults have a state constitutional privacy right and a fundamental due process freedom to refuse to take antipsychotic medications. (See, e.g., *Williams, supra*, 356 F.3d at pp. 1053–1054; *In re Qawi* (2004) 32 Cal.4th 1, 14 [7 Cal.Rptr.3d 780, 81 P.3d 224].) In light of those individual interests, significantly impaired by the challenged condition of probation, we find the medication condition was unreasonable in this case. (*People v. Lent, supra*, 15 Cal.3d at p. 486.) It " '(1) has no [reasonable] relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality.' " (*Ibid.*)

True, defendant reported a long mental health history. However, he was not, so far as we can tell, influenced to commit his crime by being off his medications or even by his underlying mental health issues. He evidently committed the crime to pay off a drug debt, which is not an uncommon or medically related motive. Putting him into a drug treatment program (which was also accomplished through the conditions of probation) was an appropriate intervention. But the medication requirement goes much further based upon an unsubstantiated link between his mental health issues and his crime.

The Attorney General points out that defendant attempted to commit suicide by taking over-the-counter sleeping pills when he was 14 years old,[4] and he had suicidal thoughts after the theft in this case. But a suicide attempt five years before the crime provides no reasonable basis for imposing a medication requirement on defendant, nor does the mere reporting of suicidal thoughts. The potent nature of the psychoactive drugs which defendant may be ordered to take calls for especially careful inquiry before their ingestion is imposed as a mandatory condition of probation.

Indeed, we modified the condition of probation in *Luis F*. to specify that the minor would be required to take medications only for his specifically diagnosed conditions of depression and social anxiety disorder. (*Luis F., supra*, 177 Cal.App.4th at p. 192.) We distinguished *Williams* in part on the basis that we were dealing with milder antidepressants and anxiolytics, not the Haldol at issue in *Williams* or other antipsychotic medications with the severe side effects discussed in the Supreme Court's forced administration cases. (*Luis F., supra*, at pp. 186–187.)

According to defendant's medical authorities—which are not contradicted by the Attorney General—several of the drugs he had been taking both before

---

[4] The alcohol and drug report prepared by Bay Area Community Resources indicates the suicide attempt was at age 17. Either way it was a substantial period before the present offense.

being jailed and after were antipsychotics[5] with significant side effects, including collectively pseudoparkinsonism, seizures, neuroleptic malignant syndrome, cardiac arrest, circulatory collapse, tremors, tachycardia, leukocytosis, urinary incontinence, hypothyroidism, memory loss, and the list goes on. (Mosby's Nursing Drug Reference (2008) 261–264 [chlorpromazine], 288–289, 620–621, 875–876 [quetiapine].) Adults have significant liberty and privacy interests in deciding whether they are willing to risk such serious side effects. One of the drugs, clonazepam,[6] is a controlled substance (Health & Saf. Code, §§ 11057, subd. (d)(7), 11375, subd. (c)(2)), which could be a valid reason for declining to take it for someone like defendant, who was already addicted to OxyContin.[7]

The minor in *Luis F.* had been taking the medications in question on a voluntary basis, with his parents' consent and encouragement, long before the court imposed the condition of probation. (*Luis F., supra,* 177 Cal.App.4th at pp. 182, 189.) No objection to the medication condition was registered at Luis's dispositional hearing, and so far as the record disclosed, neither Luis nor his parents were opposed to his continuation on the drugs. (*Id.* at pp. 181–182 & fn. 5.)

Defendant here had also been taking medication voluntarily before he was arrested for this offense. But unlike the minor in *Luis F.*, defendant here complained that he did "not like the way the new medications [made] him feel" when the jail physicians changed his prescriptions. His attorney also objected to the condition of probation when it was imposed.

The Attorney General suggests defendant's underlying mental problems were "inevitably intertwined" with his abuse of OxyContin, and thus could ultimately be faulted as the cause of this crime. Significantly, however, no medically based information was gathered to support such a supposition.

True, the probation officer predicted that "without appropriate treatment, [defendant's] ability to comply with probation conditions may be compromised." The court also noted that in sentencing negotiations the defense had pleaded for leniency in part based on the "alleged underlying mental health

---

[5] Although defendant uses the terms "psychotropic" and "antipsychotic" interchangeably, we distinguished between those terms in *Luis F., supra,* 177 Cal.App.4th at pages 186–187 and footnote 9. Nomenclature aside, the Attorney General does not appear to contest the fact that the drugs which defendant had been prescribed were among those carrying the potential side effects identified in text.

[6] Luis F. was also taking Klonopin (*Luis F., supra,* 177 Cal.App.4th at p. 180), which is a brand name for clonazepam, but he did not have a history of addiction, as does defendant in this case.

[7] Ironically, defendant's probation was later revoked and reinstated with additional jail time in part for possession of clonazepam without a prescription.

issues that Mr. Petty has suffered with." It further opined, "[I]t seems to me fairly clear that a part of the defendant's criminality relates to his mental health. As a matter of fact that was urged as to one of the conditions reasons why the Court should take a fairly lenient . . . position regarding the defendant which I believe the indicated sentence does."

Whatever was said in that regard by defense counsel is not contained in the record. But we do not think defense counsel's plea for leniency on the basis of defendant's mental health deficits can bind defendant to continue on a course of medication dictated by his mental health worker. No medical opinion was referenced by the probation officer or the court. We have only the court's unsupported speculation that "the conditions generally that relate to mental health are relating to this crime and relates to criminal conduct in that . . . mental health issues I think contributed somewhat to the defendant's situation."

These excerpts are the closest the record comes to articulating a reason for the medication requirement. Exactly which medications were prescribed for which disorders, what their side effects might be, and whether the decision to decline to. take such medications would increase the risk of future criminal conduct were matters that simply were not explored before the condition of probation was imposed. (Cf. *People v. Christiana* (2010) 190 Cal.App.4th 1040, 1052 [119 Cal.Rptr.3d 191] [order for involuntary administration of antipsychotics to render defendant competent for trial reversed where exact diagnosis and prescription were not before court].) We find nothing in the record to show what defendant's symptoms are when he is unmedicated, exactly how the medications have benefited him, or (aside from the probation officer's prediction) whether continuing on antipsychotic medications would help him to avoid future criminality.

█ We emphasize there was absolutely no medical input on these issues. We found in *Luis F.* that "to the extent a 'medically-informed' record might be required, we believe this case provides one." (*Luis F., supra,* 177 Cal.App.4th at p. 190.) We cannot say the same in the present case. We agree with *Williams*, at least where an adult objects to imposition of antipsychotic medication as a condition of probation, before such medication may be required a medically informed record must be developed in the trial court. (*Williams, supra,* 356 F.3d at pp. 1056–1057.)

While much faith is routinely placed in a probation officer's judgment as to how best to rehabilitate a defendant, we cannot leave the vital linkage between a medication condition of probation and the defendant's past or future criminal conduct to the hunch of a probation officer whose credentials to opine on such matters have not been established. We are not dealing with

commonsense conclusions, but with predictions relating to serious illnesses and potent medications—matters requiring medical knowledge beyond the expertise of the probation department. Medically informed justification for insisting upon defendant's compliance with his mental health worker's medical decisions is simply absent from the record in this case.

Nor was the probation order narrowly drawn. Indeed, the court's probation order is so broad that it could cover any form of medication, whether or not related to defendant's mental health or his criminality. (Cf. *Luis F., supra*, 177 Cal.App.4th at p. 184.) Even if we could assume the "mental health worker" would insist only on his taking mental health medications, we remain concerned that the decision whether defendant must take a particular drug has been delegated to a "mental health worker" whose exact relationship with defendant is not clear from the record and whose qualification to make medical decisions on defendant's behalf is not established. (Cf. *People v. Leon* (2010) 181 Cal.App.4th 943, 953–954 [104 Cal.Rptr.3d 410] [probation officer may not be given "unfettered discretion" to dictate terms of probation]; *U.S. v. Mike* (10th Cir. 2011) 632 F.3d 686, 699 [improper to delegate to probation officer decision whether defendant must take psychotropic medications as a condition of supervised release].)

In *Luis F.*, on the other hand, the medication condition, as modified, required defendant to follow his own chosen doctor's prescriptions with respect to specified medical conditions. (*Luis F., supra*, 177 Cal.App.4th at p. 192.) In light of that direct doctor-patient relationship, Luis presumably would have had input in the medical decisions based on how he responded to any given medication. We thus left it up to a doctor, in consultation with the patient, to determine the appropriate course of medication.

Presumably a doctor's prescription would also be a prerequisite to any mandated medication under defendant's condition of probation. But when an individual is on a complicated medical regimen for various mental conditions, leaving it to an unidentified "mental health worker" to determine whether and which medications will, in fact, be taken constitutes a threat not only to defendant's liberty interests but to his physical and mental well-being. Such extraordinary interference with defendant's self-autonomy is not warranted on this record.

Although we do not know whether defendant's mental health worker has ordered him to continue taking antipsychotic drugs, such an order would need to be followed under the condition of probation unless defendant addressed a "timely objection" to the court. Presumably such a condition would remain mandatory until a decision was made on any objection. Giving the defendant a belated judicial remedy does not in our view eliminate the problem.

Defendant's refusal to follow his mental health worker's instructions even temporarily could result in revocation of probation and a return to custody. And if he abided by the condition of probation he would be subject to the potential side effects of the drugs until the issue could be sorted out by the court.

■ Because there was no medically informed showing on the record before us that defendant's adherence to a particular medication regime was reasonably related to his criminal offense or his future criminality, we will strike the medication condition of probation.

*Requirement that defendant stay 50 yards away from the victim's residence*

Defendant next contends the condition of probation requiring him to maintain a distance of at least 50 yards from the victim's home was unreasonable and unconstitutional. Here we disagree.

This theft was unlike many others in that the victim had known defendant since he was in preschool. Defendant nevertheless stole nearly $10,000 worth of jewelry from her house while attending a party hosted by her daughter. By his own account defendant also went to the house on several later occasions uninvited (i.e., to put the jewelry under the fence in the dead of night, to check on the jewelry the next day, and to apologize and confess to the victim). Whether his claim of having attempted to return the jewelry is believable or not, it appears defendant has attempted to make himself welcome where he is not. The victim may rightly feel violated by his unannounced approaches to her home and his middle-of-the-night visits. She might worry that he will steal from her home again. It was reasonable for the court to order defendant to stay away from the house where the theft occurred.

Defense counsel objected at sentencing to the proposed 100-yard stay-away order. The court reduced the distance to 50 yards. Fifty yards is not an unreasonable distance. (Cf., e.g., *People v. Hall* (1990) 218 Cal.App.3d 1102, 1104, fn. 2 [267 Cal.Rptr. 494] [defendant ordered to stay 100 yards from victim's residence]; *In re Veronica G.* (2007) 157 Cal.App.4th 179, 183 [68 Cal.Rptr.3d 465] [100 yards from victim].)

Defendant claims the restriction violates his right to intrastate travel, citing *People v. Beach* (1983) 147 Cal.App.3d 612 [195 Cal.Rptr. 381] and *In re White* (1979) 97 Cal.App.3d 141 [158 Cal.Rptr. 562]. In *In re White, supra,* 97 Cal.App.3d at pages 148–152, the Fifth Appellate District granted a writ of habeas corpus requiring elimination or modification of a condition of probation prohibiting a prostitute from going into certain high prostitution areas of

the city, in part because it interfered with her right to intrastate travel. In *People v. Beach, supra,* 147 Cal.App.3d at pages 619–623, the court held a condition of probation requiring an elderly widow convicted of involuntary manslaughter to relocate from her home community was overbroad and violated her constitutional rights. The intrusion on defendant's travel is minimal by comparison and the forbidden zone is specifically linked to his past crime. Indeed, we have upheld more onerous restrictions on the right to travel. (*In re Victor L.* (2010) 182 Cal.App.4th 902, 931–932 [106 Cal.Rptr.3d 584].) There is no substantial interference with defendant's constitutional rights in this case and we perceive no abuse of discretion.

## Stay-away order

Finally, defendant claims the court had no authority to issue a stay-away order requiring him to stay not only 50 yards away from the victim's home, but 100 yards away from the victim and her daughter. Although there were no-contact and no-harassment conditions of probation,[8] the only provision requiring him to maintain a specified distance from the mother and daughter is contained in the protective order. The order also prohibited defendant from harassing or stalking the victim or her daughter and forbade similar conduct otherwise unlawful (e.g., assault).[9]

Unlike many property crimes perpetrated against strangers, defendant's family and the victim's family had known each other for many years. By stealing the victim's valuable jewelry (some of which were family heirlooms) while he was a guest in her home defendant violated a long-standing family friendship and committed a serious breach of trust. When asked to provide a statement to the probation department, defendant expressed his suspicion that the victim's daughter stole $500 from his home a year earlier. Such an accusation suggests there may have been more personal hostilities influencing the crime than are involved in a typical theft.

Defendant claims a protective order may only be issued to protect witnesses during trial under section 136.2, to protect domestic violence victims from further abuse under section 1203.097, or to protect stalking victims under section 646.9, subdivision (k). This case, he argues, does not involve such circumstances or meet the prerequisites under those sections.

---

[8] One condition of probation provided: "Defendant ordered not to contact, call or otherwise communicate with the victim . . . or her daughter . . . during probationary period." Another condition required that he "not engage in any further acts of violence, threats, stalking, sexual abuse, or harassment involving the victim." Defendant does not challenge these probation conditions.

[9] The stay-away order provided in part: "The defendant must not harass, strike, threaten, assault (sexually or otherwise), follow, stalk, molest, destroy or damage personal or real property, disturb the peace, keep under surveillance, or block movements of the named protected persons."

■ We may agree for purposes of argument that protective orders are expressly authorized by statute only for crimes involving interpersonal violence, threats, terrorism, sexual misconduct and the like. Indeed, the prosecutor in this case said, "I don't necessarily see a reason to keep him away from the victims, there wasn't any violence or anything of that nature, but I do think a stay away order from the residence is appropriate." Nevertheless, whether an emotional violation and breach of trust are grounds for issuing a protective order appears to be subject to the court's discretion. (§ 1203.1, subd. (j).) While it may be unusual to impose such an order for a property offense alone, defendant has directed us to no case holding such an order cannot be issued in such circumstances.[10]

Defendant relies on *People v. Selga* (2008) 162 Cal.App.4th 113, 118–120 [75 Cal.Rptr.3d 453] (*Selga*), in which the Third Appellate District struck a stay-away order issued to protect the boyfriend of a woman who had been stalked by the defendant, despite that the boyfriend himself had been threatened by the defendant. *Selga* held the order was not authorized under either section 136.2 or 1203.097, but that it could lawfully have been issued under section 1203.1, subdivision (j), under which "the court enjoys wide discretion . . . to impose a stay-away order as a condition of probation . . . ." (*Selga, supra*, 162 Cal.App.4th at p. 118.) In *Selga* the stay-away order had been expressly issued under section 1203.097,[11] which is intended to protect victims of domestic violence. This was improper because the boyfriend did not fall within the class of protected persons under that statute. (*Selga, supra*, at p. 119.) For that reason the court held the stay-away order was unauthorized. But the court remanded the case to allow reissuance of the order under the correct section (§ 1203.1, subd. (j)) if the trial court so desired. (*Selga, supra*, at p. 121.)

The Attorney General responds that the present stay-away order, unlike that in *Selga*, was lawfully issued under section 1203.1, subdivision (j).[12] The language of that section is broad enough to allow a stay-away order in the

---

[10] It is not clear from the record whether the victim and her daughter requested the stay-away order or whether the probation officer simply thought it was a good idea. The court indicated, however, that if the victims requested modification of the order it would "favorably consider" such an application.

[11] Perhaps for that reason *Selga* did not discuss the availability of such an order under section 646.9, subdivision (k) (stalking, including willful and malicious harassment).

[12] Section 1203.1, subdivision (j) provides in pertinent part: "The court may impose and require any or all of the above-mentioned terms of imprisonment, fine, and conditions, and other reasonable conditions, as it may determine are fitting and proper to the end that justice may be done, that amends may be made to society for the breach of the law, for any injury done to any person resulting from that breach, and generally and specifically for the reformation and rehabilitation of the probationer, and that should the probationer violate any of the terms or conditions imposed by the court in the matter, it shall have authority to modify

present case, even though it did not involve a sex offense, domestic violence, or stalking. (See fn. 12, *ante*; cf. *Selga, supra*, 162 Cal.App.4th at p. 120.)

Defendant claims the order was not in fact issued under that section because the court had already finished imposing the conditions of probation when it issued the protective order. We believe the Attorney General's interpretation of the record is correct and the court's use of a stay-away order, in addition to a no-contact condition of probation, was lawful.

The stay-away order was signed immediately after the judge imposed conditions of probation requiring defendant to stay 50 yards away from the victim's home, prohibiting him from having contact with the victim or her daughter, and prohibiting him from stalking or harassing the victim or her daughter, with comparable terms also included in the stay-away order.

We see nothing in the record to suggest the court purported to act under any of the statutes specially authorizing protective orders. Instead we note that section 1203.1, subdivision (j) was cited to and by the court as indicative of its broad discretion in imposing conditions of probation shortly before the protective order was issued. We believe the court then acted under that broad general power. Under that section, defendant acknowledges the court had authority to issue such an order.

Defendant also argues the order was "unnecessary and unconstitutional" in that it was duplicative of the conditions of probation. Whatever duplication exists provides no reason to strike the order. The stay-away order makes more concrete the no-contact and no-harassment conditions of probation and sets up an additional incentive for defendant to avoid future criminal violation of those conditions.[13]

Defendant also argues, insofar as it contained a 50-yard stay-away zone for the victim's house and a 100-yard stay-away zone for the victim and her daughter, the protective order was overbroad because it restricts his rights to travel and freely associate. As indicated above, any impact on his right to travel is strictly limited, as is the impact on his freedom of association. He has no "right" to associate with those who shun him because of his past crimes against them.

At defendant's request, however, we will modify the protective order to provide that defendant must not "knowingly" come within 100 yards of the

and change any and all the terms and conditions and to reimprison the probationer in the county jail within the limitations of the penalty of the public offense involved."

[13] A noncriminal violation of the stay-away order could only result in revocation of probation and imposition of the punishment authorized for the underlying theft, not a separate contempt sentence. (*People v. Johnson* (1993) 20 Cal.App.4th 106, 112–113 & fns. 4 & 5 [24 Cal.Rptr.2d 628].)

victim or her daughter. (See, e.g., *In re Sheena K.* (2007) 40 Cal.4th 875, 890–892 [55 Cal.Rptr.3d 716, 153 P.3d 282]; *People v. Moses* (2011) 199 Cal.App.4th 374, 376–377 [131 Cal.Rptr.3d 106]; *In re Victor L., supra*, 182 Cal.App.4th at pp. 911–912; *People v. Leon, supra*, 181 Cal.App.4th at p. 950.)

## DISPOSITION

The condition of probation requiring defendant to take medications as instructed by his mental health worker is stricken. The provision of the stay-away order is modified to provide that defendant "shall not knowingly come within 100 yards of the protected persons." The judgment and orders, as modified, are affirmed.

Haerle, Acting P. J., and Lambden, J., concurred.