# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

ABISAI RIVERA-GUERRERO,
        *Defendant-Appellant.*

No. 04-50493

D.C. No.
CR-03-02294-NAJ

OPINION

Appeal from the United States District Court
for the Southern District of California
Napoleon A. Jones, District Judge, Presiding

Argued and Submitted
January 10, 2005—Pasadena, California

Filed October 19, 2005

Before: Stephen Reinhardt, Richard R. Clifton,
Circuit Judges, and Charles R. Weiner,*
Senior District Judge.

Opinion by Judge Reinhardt

---

*The Honorable Charles R. Weiner, Senior United States District Judge
for the Eastern District of Pennsylvania, sitting by designation.

**COUNSEL**

Zandra L. Lopez, Federal Defenders of San Diego, San Diego, California, for the defendant-appellant.

Carol C. Lam, United States Attorney; Roger W. Haines, Jr., Assistant U.S. Attorney (On the Briefs); Garrett M. Heenan, Assistant U.S. Attorney, San Diego, California (Argued), for the plaintiff-appellee.

**OPINION**

REINHARDT, Circuit Judge:

This appeal involves questions relating to the involuntary medication of a defendant awaiting trial in federal court. After being arrested and charged with illegal entry, defendant Abisai Rivera-Guerrero was found incompetent to stand trial. Following his commitment to the Federal Medical Center ("FMC") pursuant to an order dated November 4, 2003, the FMC doctors requested that the district court issue another order permitting him to be involuntarily medicated with antipsychotic drugs for the purpose of restoring his competency so that he could stand trial. The court ordered that a hearing be held. When the hearing began, the magistrate judge decided that it would be held pursuant to *Sell v. United States*, 539 U.S. 166 (2003) rather than *Washington v. Harper*, 494 U.S. 210 (1990). After the government's witnesses, two FMC doctors, testified, defendant's counsel requested a continuance so that she could prepare her rebuttal. The district court denied the request and issued an order permitting involuntary medi-

cation. On October 4, 2004, the order was ultimately reaffirmed by the district court upon remand.

We now reverse the district court's denial of the continuance, vacate the involuntary medication order, and remand with instructions that in light of intervening events the district court obtain a report on Rivera-Guerrero's present mental condition and proceed in accordance with the second and third sentences of 18 U.S.C. § 4241(d). In so doing, the district court shall treat the "reasonable period of time" for which the Attorney General may maintain him in custody under that subsection as having expired. The order of commitment to the FMC shall be of no further force and effect.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Rivera-Guerrero was arrested on September 14, 2003 and charged with illegal entry after deportation pursuant to 8 U.S.C. § 1326(a). After undergoing a psychological examination, he was found incompetent to stand trial, just as he had been on two previous occasions. As a result, the district court delivered him to the custody of the Attorney General so that he could be "hospitalize[d] . . . for . . . a reasonable period of time not to exceed four months . . . to determine whether there is a substantial probability that in the foreseeable future" he would become competent to stand trial. 18 U.S.C. § 4241(d)(1).[1] Rivera-Guerrero was committed to the Federal Medical Center ("FMC") in Springfield, Missouri in November of 2003.

On February 6, 2004, Dr. Sarrazin and Dr. Mrad, doctors from the FMC, appeared before a magistrate judge to discuss the need to involuntarily medicate Rivera-Guerrero. Dr. Mrad

---

[1]After the expiration of the initial four month period, the statute allows for any additional "reasonable period of time" if the district court finds that there is a "substantial probability that within such additional period of time he will attain the capacity to permit the trial to proceed." 18 U.S.C.A. § 4241(d)(2)(A).

explained that the defendant refused to consent to the administration of antipsychotic medication, without which he could not be rendered competent. Following the doctors' presentation, the magistrate judge scheduled a hearing to determine Rivera-Guerrero's medical condition, the legal standard to be applied when adjudicating the FMC's request for an involuntary medication order, and the appropriateness of such an order.

Two weeks later, after briefing by the parties as to the appropriate standard, the magistrate judge held another hearing to determine finally the question of the applicable law. At the urging of both parties, the court decided to apply *Sell*, which pertains to involuntary medication for the purpose of restoring a defendant's competency for trial, rather than *Harper*, which also pertains to involuntary medication but involves the element of dangerousness. Dr. Sarrazin testified that the defendant suffered from a form of psychosis, possibly schizophrenia, and that consequently, only medication could render defendant competent. Dr. Sarrazin stated that Rivera-Guerrero could be safely medicated because he planned on experimenting with several different drugs — starting with "atypical" antipsychotics and moving to "typicals," if necessary, in light of the side-effects.[2] For example, Dr. Sarrazin suggested administering one of the newer atypical drugs, such as risperidone, which he acknowledged could cause nausea, cognitive clouding, sedation, tardive dyskinesia,[3] and diabe-

---

[2]Antipsychotic medication is currently divided into two categories: "typicals" and "atypicals." Typicals are older medications that were relied upon extensively during the latter half of the 20th century to treat psychosis. Atypicals are the next generation of antipsychotics. There is some evidence that atypicals cause less side-effects than typicals. However, some believe that atypicals are at best no better than the typicals, and at worst, responsible for a different set of potentially more dangerous side-effects.

[3]"Tardive dyskinesia is a neurological disorder, *irreversible in some cases*, that is characterized by involuntary, uncontrollable movements of various muscles, especially around the face." *Harper*, 494 U.S. at 230 (emphasis added).

tes. If one of the atypicals produced intolerable side effects, Dr. Sarrazin continued, he would slowly change Rivera-Guerrero's medical regime to another atypical. If Rivera-Guerrero refused medication in contravention of a court order, then the doctor would select a drug that could be forcibly injected.

Dr. Sarrazin did not state that such experimentation would have a significant likelihood of rendering the defendant legally competent. Instead, he explained that according to a Bureau of Prisons study, "about 76 percent or so [of the patients] that were involuntarily medicated were restored to competency." He could not say that he had enjoyed this kind of success rate with his own patients or, more important, with any of the drugs that he proposed. Indeed although Dr. Sarrazin explained that these medications would be very helpful in "the treatment of [the defendant's] underlying mental illness and his delusions," it would only be after the drug had already been administered and its effects known "that [the FMC] would be able to tell more about his competency." Moreover, Dr. Sarrazin acknowledged that despite the variety of drugs that he proposed, in his personal experience they had been successful in restoring to competency only three patients. Following Dr. Sarrazin's testimony, Dr. Mrad told the court that it was his opinion also that only medication could restore Rivera-Guerrero's competency. He specifically rejected all alternative forms of treatment.

At the conclusion of the hearing, counsel for Rivera-Guerrero asked the magistrate judge for a continuance so that she could consult independent doctors about the drugs that Dr. Sarrazin proposed using and obtain an independent expert medical opinion regarding the effectiveness and medical appropriateness of the FMC's suggested course of treatment. Counsel intended to use the continuance to interview doctors, and help prepare a medical expert who would rebut the testimony of the FMC physicians. The magistrate judge denied counsel's request, proceeded directly to her decision, and

found the evidence sufficient to justify involuntary medication. She then issued an order authorizing Rivera-Guerrero's involuntary medication and extended his commitment at the FMC for an additional four months pursuant to 18 U.S.C. § 4241(d)(1).

After the issuance of the involuntary medication order, defense counsel promptly appealed it to a district judge — alleging that the magistrate judge lacked the constitutional and statutory authority independently to issue an order for involuntary medication. She also appealed the magistrate judge's determination on the merits. Counsel presented the district court with several articles describing the powerful, fatal, and trial-related side-effects of antipsychotic medication. The district judge then made several rulings. He dismissed the articles on hearsay grounds because no medical expert had been retained to lay the foundation for their introduction into evidence, and affirmed the magistrate judge's denial of Rivera-Guerrero's request for a continuance, thus foreclosing the defendant from presenting any independent medical expert. He also upheld the authority of the magistrate judge and affirmed the order on the merits under a clear error standard.

Counsel for Rivera-Guerrero then filed an appeal to this court. Without reaching the merits, we vacated the magistrate judge's order on the ground that "an involuntary medication order is not the type of pretrial matter the Federal Magistrates Act permits district courts to delegate final authority to magistrate judges." *United States v. Rivera-Guerrero*, 377 F.3d 1064, 1071 (2004). As a result, the district court's decision was vacated with instructions that the district judge review the merits of the magistrate judge's decision *de novo* instead of for clear error.

Following our remand, the district court received a letter from the FMC stating that on August 31, 2004, medical personnel involuntarily medicated Rivera-Guerrero in an emer-

gency procedure pursuant to 28 C.F.R. § 549.43(b). The letter also stated that the FMC will continue to involuntarily medicate Rivera-Guerrero "unless or until the Court advises them to stop." In response to this new development, counsel for Rivera-Guerrero requested an evidentiary hearing to explore the facts behind the emergency medication and the effects, if any, the medication had on Rivera-Guerrero's competency. Counsel also explained that the evidentiary hearing was necessary to update the court on the medical condition of Rivera-Guerrero, whom defense counsel had not seen in almost a year. The request, however, was denied by the district court.

On October 4, 2004, the district judge issued an opinion adopting the recommendations of the magistrate judge for reasons nearly identical to those contained in the order we had previously vacated. He denied a stay in part because he concluded that the emergency medication of Rivera-Guerrero rendered the order's provisions moot. This court denied a stay as well. Rivera-Guerrero appeals the district court's October 4th order.

## DISCUSSION

### A.   The Law of Involuntary Medication

Although we resolve this appeal on the ground that the district court erred in failing to grant the defendant a continuance, the law regarding involuntary medication guides our determination on that question. The Supreme Court's refusal to permit involuntary medication except in highly-specific factual and medical circumstances illustrates the importance of a complete factual and medical record upon which a judge can base his decision. Recognizing what is at stake, we must be vigilant in our review of procedural rulings that deny the defendant an opportunity to challenge the government's case.

"The Supreme Court has thrice recognized a 'liberty interest in freedom from unwanted antipsychotic drugs.' " *United*

*States v. Williams*, 356 F.3d 1045, 1053 (9th Cir. 2004) (quoting *Riggins v. Nevada*, 504 U.S. 127, 137 (1992)). In *Washington v. Harper*, the Court held that prisoners "possess[ ] a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." 424 U.S. at 221. It explained that involuntary medication is permitted only for "inmates who are . . . gravely disabled or represent a significant danger to themselves or others," *id.* at 226, and only after the court is satisfied that the medication would be "in the prisoner's medical interests, given the legitimate needs of his institutional confinement." *Id.* at 222.

Two years later in *Riggins v. Nevada*, the Court again proclaimed that an individual has a constitutionally protected right to "avoid[ ] involuntary administration of antipsychotic drugs," only this time in the context of a criminal defendant facing trial. 504 U.S. at 134. The defendant who was involuntarily medicated pending trial challenged his ensuing conviction; he alleged that because he was forced by the state to continue his antipsychotic medication even after he had decided that he no longer wished to do so, he was prejudiced by the subtle but significant effects of the anti-psychotic drug upon his demeanor and his ability to testify at trial. *See id.* at 132. The Supreme Court agreed. It reversed the defendant's murder conviction, holding that the record before the state court failed to justify its involuntary medication order, and that there was a likelihood that the defendant was prejudiced by the drug. *Id.* at 137.

**[1]** Most recently in *Sell v. United States*, 539 U.S. 166 (2003), the Supreme Court, extrapolating from *Harper* and *Riggins*, held that the "Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, *but only if* the treatment is "*medically appropriate, i.e.*, in the patient's best medical interest in light of his medical condition," *id.* at 181

(emphasis in original), is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests," *id.* at 179. Noting that the case was dissimilar to *Harper* in that in *Sell* the government's only proffered interest in involuntary medication was to render the defendant competent to stand trial, the Court explained that unlike in *Harper*, the decision was not entirely medical in nature. Indeed, according to the Court, the "balanc[ing of] harms and benefits" required by *Sell* "related to the more quintessentially legal questions of trial fairness and competence." *Id.* at 182. Subsequent to *Sell*, we held that in light of the importance of judicial balancing, and the implication of deep-rooted constitutional rights, a court that is asked to approve involuntary medication must be provided with a complete and reliable medically-informed record, based in part on independent medical evaluations, before it can reach a constitutionally balanced *Sell* determination. *See Williams*, 356 F.3d at 1056 (citing *Harper*, 494 U.S. at 233-35 (emphasizing the necessity for independent medical decisionmaking in the context of involuntary medication)).

Sell orders are disfavored. The Supreme Court clearly intends courts to explore other procedures, such as *Harper* hearings (which are to be employed in the case of dangerousness) before considering involuntary medication orders under *Sell*. The *Sell* Court explained that "[t]here are often strong reasons for a court to determine whether forced administration of drugs can be justified on . . . alternative grounds *before* turning to the trial competence question." *Sell*, 539 U.S. at 182 (emphasis in original). It preferred the dangerousness inquiry under *Harper* because that inquiry is ordinarily more "objective and manageable" than one based entirely on the interest of the government in rendering a defendant competent to stand trial. *Id.* (quoting *Riggins*, 504 U.S. at 140) (internal quotation marks omitted). The Court explained that even if the government requests an order on *Sell* grounds, a judge

should "ordinarily determine whether the Government seeks, or has first sought, permission for forced administration of drugs on these other *Harper*-type grounds; and, if not, why not." *Id.*[4]

**[2]** *Harper*, *Riggins*, and *Sell* demonstrate the Court's reluctance to permit involuntary medication except in rare circumstances. *See e.g.*, *Sell*, 539 U.S. at 180 (noting that while the *Sell* "standard . . . permit[s] involuntary administration of drugs solely for trial competence purposes in certain instances[,] . . . those instances *may be rare*." (emphasis added)); *Riggins*, 504 U.S. at 127 (explaining that involuntary medication is "impermissible absent a finding of overriding justification"). The importance of the defendant's liberty interest, the powerful and permanent effects of anti-psychotic medications, and the strong possibility that a defendant's trial will be adversely affected by the drug's side-effects all counsel in favor of ensuring that an involuntary medication order is issued only after both sides have had a fair opportunity to present their case and develop a complete and reliable record.

B.   Denial of a Continuance and the Need for an Evidentiary Hearing

The dispositive question on this appeal is whether the district court abused its discretion in denying the defendant's request for a continuance. The defendant sought the continuance so that he could obtain the services of a medical expert who would be able to rebut the testimony of the two FMC doctors. The district court's ruling deprived him of an "independent . . . evaluation . . . by a medical professional . . . as

---

[4]The record strongly suggests that in the case before us the district court should have conducted a *Harper* dangerousness hearing instead of proceeding under *Sell*. Nevertheless, in light of our decision to remand on other grounds and the subsequent change in circumstances, including the emergency administration of involuntary medication and the substantial passage of time, we need not decide that issue here.

well as an opportunity . . . to challenge the evaluation and offer his or her own medical evidence in response." *Williams*, 356 F.3d at 1056. Indeed, the continuance resulted in the defendant's inability to present any evidence that might rebut the government's medical assertions. Because defendant's counsel acted reasonably in relation to preparing for the hearing, a continuance was important to her presentation of an adequate defense, the record fails to reflect that a continuance would have caused any substantial inconvenience to the court or the parties, and the defendant was prejudiced by the denial of a continuance, we hold that the district court abused its discretion in denying the defendant's request.

**[3]** A district court's denial of a continuance is reviewed for an abuse of discretion. Reversal is required if "after carefully evaluating all the relevant factors," we conclude that "the denial was arbitrary or unreasonable." *See United States v. Flynt*, 756 F.2d 1352, 1358 (9th Cir 1985). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). Although we have stated that our inquiry is not mechanical, we have developed a four factor test to guide our analysis, which includes:

> [1] the extent of appellant's diligence in his efforts to ready his defense prior to the date set for hearing . . . [2] how likely it is that the need for a continuance could have been met if the continuance had been granted . . . [3] the extent to which granting the continuance would have inconvenienced the court and the opposing party, including its witnesses . . . [4] the extent to which the appellant might have suffered harm as a result of the district court's denial.

*Flynt*, 756 F.2d at 1359. None of the first three factors is ordinarily dispositive. The defendant must, however, establish the

fourth — prejudice. *Id.* Here, our assessment of the *Flynt* factors reveals that at least three of them, including the prejudice factor, support reversal of the district court's order.

i. Diligence

The first factor we consider is diligence. The government argues that the district court's denial of Rivera-Guerrero's request for a continuance was proper because the defendant's need for the continuance was caused by counsel's lack of diligence in preparing his defense. The government points out that the magistrate judge denied defendant's request for a continuance because, "[t]he defense was aware of this hearing, the nature of the hearing, the date of the hearing," and should have presented its expert rebuttal evidence at the hearing. The district court, in reviewing the magistrate judge's decision, affirmed the denial on the same ground.

**[4]** The diligence factor does not play a significant role in our resolution of this appeal. Even if we assume that defense counsel's preparation was not exemplary and that counsel could have obtained the services of a medical expert prior to the hearing,[5] defendant's request for additional time should have been granted. Had the defendant retained an expert for

---

[5]It is unclear that defense counsel had the information necessary to secure a competent expert before the February 19th hearing, given the lack of specific information provided prior to that date. When counsel asked the FMC doctors at the February 6th hearing which specific drugs would be used in the course of treatment, Dr. Sarrazin simply offered a list of the available drugs — including Alanzapin, Risperidone, Perazidone, Haloperidol and Phuphesedene — instead of identifying the specific drug or drugs that the FMC intended to administer. Dr. Sarrazin went on to confirm that he would not be able to say "at this point . . . exactly what medication" would be used and that often, many medications may be attempted before finding one that is effective. Indeed, it was not until the hearing itself that the doctors from the FMC committed to starting with Risperidone, and then to use injectable Geodon (which was not mentioned in the initial conference) or Haloperidol after that, if the FMC could not orally administer the medication.

the hearing, the expert would have needed additional time to review the specific course of treatment recommended by the FMC's doctors and the medical consequences of treating the particular defendant in the manner prescribed, because those recommendations were not disclosed prior to the hearing.[6]

As the Supreme Court has explained, at a *Sell* hearing the court is required to consider specific drugs, their unique side effects, and their medical appropriateness. Specificity as to the medications to be administered is critical. *See Sell*, 539 U.S. at 181 ("The *specific* kinds of drugs at issue may matter . . . [because d]ifferent kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." (emphasis added)); *id.* at 185 ("Whether a *particular* drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions are matters important in determining the permissibility of medication to restore competence." (citing *Riggins*, 504 U.S. at 142-45) (emphasis added). Counsel for Rivera-Guerrero attempted to

---

[6]To avoid this kind of surprise at trial, and to ensure that proper responses to, and effective cross examination of, expert testimony can be secured, the federal rules require the government, when asked, to provide a written opinion of every expert it plans to call. *See* Fed. R. Crim. P. 16(a)(1); *see also*, Fed. R. Civ. P. 26(a)(2) (providing for advance disclosure of expert reports in civil cases). Indeed, the Advisory Committee Notes to this Rule explain that it

> is intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross examination.

Fed. R. Crim. P. 16 advisory committee's note; *cf. United States v. Kelly*, 420 F.2d 26, 28 (2nd Cir. 1969) ("Indeed, it is important that the defense be given a chance to research the techniques and results of scientific tests taken by the government."). Rivera-Guerrero's *Sell* hearing was not an actual trial, and is therefore not subject to Rule 16. We note, however, that counsel's lack of knowledge about the specific drugs and the proposed course of treatment until the day of the hearing is precisely the type of predicament that Rule 16 tried to eliminate.

procure such necessary specific information in advance in order to provide an adequate rebuttal, only to be given a non-specific and unhelpful general listing of available medications by the FMC doctors before the magistrate judge terminated the inquiry. Thus, it was not until the *Sell* hearing itself that counsel was able to obtain the necessary information regarding the FMC's plans and intentions. We have held that "fairness requires that adequate notice be given the defense to check the findings and conclusions of the government's experts." *United States v. Barrett*, 703 F.2d 1076, 1081 (9th Cir. 1982) (quoting *United States v. Kelly*, 420 F.2d 26, 29 (2nd Cir. 1969) (internal quotation marks omitted)). That was not the case here.

**[5]** We reject, therefore, the district court's determination that the defendant's request for a continuance was necessitated by her own lack of diligence. Furthermore, even if counsel's request for a continuance had been due in some measure to a lack of diligence, that finding would not end our inquiry. The four-factor test of *Flynt* is not mechanically applied. We have reversed a district court's denial of a continuance even after concluding that the defendant failed the diligence prong of the analysis. *See United States v. 2.61 Acres of Land, More or Less, Situated in Mariposa County, State of Cal.*, 791 F.2d 666, 671-72 (9th Cir. 1985); *see also Flynt*, 756 F.2d at 1359 ("The weight . . . attribute[d] to any single factor may vary with the extent of the showings on the other factors.").[7] Accordingly, we turn our attention now to the remaining factors to be considered under *Flynt*.

---

[7]Moreover, if the district court should have been aware of the need for a continuance to permit the defendant to get a medical evaluation, the denial of the continuance request may constitute an abuse of discretion even if the failure to obtain the evidence earlier resulted from a lack of diligence on the defendant's part. *See United States v. Pope*, 841 F.2d 954, 956-57 (9th Cir. 1988) ("the court's colloquy with Pope should have alerted the court to the defendant's flawed perception of reality and should have underscored the importance of a continuance to enable the defense to secure a psychiatric evaluation.").

### ii.   Utility

**[6]** Next, we consider the utility of granting a continuance. Would the continuance have resulted in the production of relevant evidence? *See Flynt*, 756 F.2d at 1360. When requesting a continuance, a defendant is not required to demonstrate what specific evidence he would present if a continuance were granted; rather, a showing that evidence helpful to his position could be produced is sufficient. "To require any greater specificity under these circumstances would not have been reasonable." *Id.*

**[7]** Rivera-Guerrero's counsel informed the district court that probative evidence could be available if a continuance were granted, and described the type of evidence she would present. Substantial rebuttal evidence against involuntary medication was available to counsel had she been allowed time to prepare her client's defense. This is demonstrated by the large collection of articles expressing views contrary to those presented by the FMC that the defendant offered to the district court. *See e.g.*, Robert Whitaker, *The Case Against Antipsychotic Drugs: A 50-year Record of Doing More Harm than Good*, 62 Med. Hypotheses 5 (2004) (arguing that treating many patients without antipsychotic medication would increase recovery rates and decrease chronic illness); Maurice Rappaport, et al., *Are There Schizophrenics for Whom Drugs May be Unnecessary or Contraindicated?*, 13 INT'L PHARMACOPSYCHIATRY 100 (1978) (arguing for selective utilization of antipsychotic medication and reporting a number of schizophrenics who do relatively well long term without routine or continuous medication).[8] These articles suggest that a respect-

---

[8]Reviewing the medical literature on antipsychotic medication, some Supreme Court justices have also acknowledged the potential harmful effects of antipsychotics. *See Harper*, 494 U.S. at 239 (1990) (Stevens, J., concurring in part and dissenting in part) (noting that antipsychotics "alter the chemical balance in a patient's brain," "can cause irreversible and fatal side effects," and "[t]he risk of side effects increases over time"); *Riggins*, 504 U.S. at 138-39 (Kennedy, J., concurring) ("fil[ing a] separate opinion . . . to express doubt that the showing [necessary to support involuntary medication] can be made in most cases, given our present understanding of the properties of these drugs.")

able, though minority, portion of the medical community strongly believes that antipsychotic medications cause long-term and irreversible harm and have a high chance of producing trial-related and even fatal side-effects, and that such drugs are not universally considered medically appropriate in light of other available alternatives. A continuance would have permitted the defendant to provide testimony that would have tended to counter the claims of the FMC doctors. Without the continuance, defendant was unable to do so. The utility of granting a continuance in this case is therefore evident from the record, and this factor weighs strongly in favor of Rivera-Guerrero.

### iii. Inconvenience

[8] There is no evidence that the court, the parties, or any witnesses would have been inconvenienced by a continuance. Rivera-Guerrero's request came at the end of a hearing at which only the FMC doctors testified. No further witnesses were scheduled. "Nor [was] there any indication that the . . . delay would have necessitated the recalendaring of other matters, or otherwise have caused any significant inconvenience to the court." *United States v. West*, 828 F.2d 1468, 1470 (10th Cir. 1987).

The only argument relating to inconvenience raised by the government before the district court was its inability promptly to medicate Rivera-Guerrero, render him competent, and bring him to trial on the one count of illegal entry. It appears that the magistrate judge adopted this unconventional theory: "I feel that there have been significant delays . . . not only to make this gentleman competent but to — to get him some relief from his illness."

The district court's approach ignores the defendant's rights and misperceives the government's interests. The defendant's fundamental liberty interest is at stake. He is entitled to a full and fair hearing before being subjected involuntarily to the

administration of antipsychotic medications, and no such hearing could have occurred in the absence of a continuance. True, the government was anxious to conduct a criminal trial, but it could not do so until after the hearing regarding involuntary medication had been completed. Moreover, a delay in conducting a criminal trial of a person who is lawfully confined in a mental hospital does not, without more, constitute inconvenience to the government.

**[9]** If Rivera-Guerrero had been tried and convicted after having been granted an appropriate continuance, the fact that he would have had to begin serving his sentence at a date later than the one the government had hoped for, would not cause the government any inconvenience. If the continued hearing had resulted in a determination that Rivera-Guerrero should not be tried, certainly no inconvenience would have been suffered by anyone. Thus, this factor also weighs heavily in favor of the defendant.

### iv.    Prejudice

Unlike the other *Flynt* factors, prejudice *must* be shown by the party seeking the continuance. Here the defendant has established the requisite prejudice.

**[10]** "Where the denial of a continuance prevents the introduction of specific evidence, the prejudice inquiry focuses on the significance of that evidence." *United States v. Mejia*, 69 F.3d 309, 317 (9th Cir. 1995). The significance of the omitted evidence in this case is undisputed. Because the magistrate judge's refusal to grant a continuance precluded Rivera-Guerrero from having a fair opportunity to present rebuttal evidence to the testimony of the FMC doctors, he was involuntarily medicated solely on the basis of the evidence offered by the very doctors who requested his involuntary medication in the first place. "Thus, the result of the court's refusal to grant a continuance 'was to deprive [Rivera-Guerrero] of the only testimony potentially effective to his defense.' " *Flynt*,

756 F.2d at 1361 (quoting *United States v. Fessel*, 531 F.2d 1275, 1280 (5th Cir. 1976)); *see also United States v. Pope*, 841 F.2d 954, 958 (9th Cir. 1988) (finding prejudice where the denial of a continuance prevented the defendant from introducing "the only testimony that could plausibly have helped him."); *United States v. 2.61 Acres of Land*, 791 F.2d 666, 671 (9th Cir. 1985) (finding defendant was prejudiced because denial of a continuance prevented him from introducing any evidence in support of his position); *Armant v. Marquez*, 772 F.2d 552 (9th Cir. 1985) (finding prejudice where denial of a continuance effectively denied defendant the opportunity to prepare his own defense).

Moreover, the district court's denial of Rivera-Guerrero's request for a continuance made it impossible for a medically-informed record to be developed in the proceeding. We have held that "the unique nature of involuntary antipsychotic medication and the attendant liberty interest require that imposition of . . . [involuntary medication pursuant to *Sell*] occur only on a medically-informed record." *Williams*, 356 F.3d at 1056. We require that such a record be developed whenever a *Sell* determination is to be made — a record that "encompasses an independent and timely evaluation of the [defendant] by a medical professional, including attention to the type of drugs proposed, their dosage, and the expected duration of a person's exposure, *as well as an opportunity for the [defendant] to challenge the evaluation and offer his or her own medical evidence in response*." *Id.* (emphasis added).

By relying entirely on the medical testimony of the two FMC doctors who initiated the request to involuntarily medicate Rivera-Guerrero, and by refusing to give Rivera-Guerrero the opportunity to present in rebuttal the evaluations of independent medical experts as to his physical and mental condition and as to the medical regime the government proposed to use, the district court ordered involuntary medication without the requisite complete and reliable medically-informed record.

**[11]** In short, because the district court's denial of defendant's request for a continuance both prevented Rivera-Guerrero from presenting any evidence in his defense and deprived the court of a medically-informed record upon which the defendant's constitutional rights could be weighed against the government's interest, we conclude that prejudice is clearly established.

v.   Summary

**[12]** Rivera-Guerrero has a constitutional right not to be involuntarily medicated in the absence of a full and fair hearing. Our analysis of the four *Flynt* factors, as set forth *supra*, plainly demonstrates that the denial of a continuance was arbitrary and unreasonable and served to deny the defendant due process of law. *See Flynt*, 756 F.2d at 1359 (reversing denial of a continuance and stating that "appellant was entitled to call psychiatric witnesses of his own choosing who, after examining appellant, could testify as to his mental state"). Accordingly, we reverse the district court's order and remand for further proceedings.

C.   On Remand

Although we remand this case for further proceedings because of the district court's refusal to grant the defendant's request for a continuance, since the time of the defendant's last hearing his factual circumstances have changed dramatically. The district court received a report from the FMC that pursuant to its emergency powers, Rivera-Guerrero had been involuntarily medicated because of alleged dangerousness. The forced administration of medication has already occurred and Rivera-Guerrero has already been confined in a suitable facility for more than the permissible period of time. Accordingly, on remand, conducting a *Sell* inquiry no longer constitutes the appropriate procedure.

Under § 4241(d), after conducting a hearing and finding that a defendant is incompetent to stand trial, the court com-

mits him to a suitable facility under the custody of the Attorney General for a "reasonable period of time, not to exceed four months." *Id.* This period may be extended for "an additional reasonable period of time until" the defendant is restored to competency if the court concludes that "there is a substantial probability that within such additional period of time [the defendant] will attain the capacity to permit the trial to proceed; or . . . the pending charges against him are disposed of according to law; whichever is earlier." *Id.* Courts have generally construed this subsection to allow extensions for a reasonable period of time only when "the individual is likely to attain competency within a reasonable time." *See e.g.*, *United States v. Baker*, 807 F.2d 1315, 1320 (6th Cir. 1986). Thereafter, the defendant may be tried, if competent, or, if not, either civil commitment proceedings must be instituted against him under 18 U.S.C. § 4246 or he must be released. Because of the extended period of time that has transpired since Rivera-Guerrero was committed to the FMC, almost two years, and since the FMC commenced treating him with antipsychotic medication, approximately one year ago, it seems clear that the statutory "reasonable period of time" has expired and that his commitment under § 4241 must be terminated. The only questions that remain are: what has been the result of the FMC's medical treatment and what are Rivera-Guerrero's legal rights and remedies presently?

Upon remand, the district court is directed to order the FMC to submit a report promptly on Rivera-Guerrero's current medical status, including how he has responded to the emergency involuntary medication and whether such treatment is presently continuing. If the FMC reports that Rivera-Guerrero has been rendered competent to stand trial as a result of its administration of the medication, and the district court accepts that assertion, then the district court may proceed with the criminal trial should the government still desire to do so. If the defendant challenges the FMC report, however, the court shall hold an appropriate hearing before determining whether to accept the report and its findings and conclusion.

*See* 18 U.S.C. § 4241(d). If, in contrast, the FMC report asserts that, despite the passage of time and the administration of involuntary medication, Rivera-Guerrero has not been rendered competent and the district court accepts that representation, then civil commitment proceedings may be initiated against him as provided in § 4246 (if appropriate in light of his Mexican citizenship), deportation proceedings may be undertaken (if such proceedings would be lawful notwithstanding his incompetence), or he shall be unconditionally released.

## CONCLUSION

The administration of involuntary medication ordinarily constitutes a serious and substantial constitutional violation of a defendant's liberty interest. Although certain exceptions exist to the general rule prohibiting involuntary medication, the law recognizes "the importance of independent medical decision-making" and the need for defendants to have the "opportunity . . . to challenge [the adverse] medical evidence." *Williams*, 356 F.3d at 1056. Because the district court's denial of a continuance deprived the defendant of the opportunity both to present such a challenge and to offer its own independent expert witnesses, and because, as a result, a complete and reliable medically-informed record could not be developed, the district court's order is reversed. On remand, the district court shall obtain a report from the FMC and determine defendant's current mental status. *See* 18 U.S.C. § 4241(d). Depending on the court's determination as to the defendant's competence to stand trial, the government may prosecute him on the pending charges, deport him, if lawful under the applicable immigration statutes, institute civil commitment proceedings under § 4246, if appropriate, or release him unconditionally.

**REVERSED AND REMANDED.**