Filed 11/18/13  P. v. Tabayoyon CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>DON TALERO TABAYOYON,<br><br>  Defendant and Appellant. | H038743<br>(Monterey County<br> Super. Ct. No. SS120848) |

Defendant Don Talero Tabayoyon filed this appeal from an order subjecting him to involuntary medication after the trial court found him incompetent to stand trial on charges of issuing criminal threats.  He contends the order is defective in several respects.  However, while the appeal was pending he underwent treatment and was restored to competence, whereupon the court placed him on probation based upon a preexisting plea.  Respondent contends, among other things, that these developments render the appeal moot.  We will sustain this contention and dismiss the appeal.

BACKGROUND

*A.  Underlying Facts*

According to the probation report, police went to a home in Marina on May 6, 2012, when a woman called saying that a male neighbor was yelling at her and at a teenager, whom he accused of trying to run him off the road, and whom he had

threatened to kill. When police arrived, they spoke to defendant, who apparently lived with his mother. He admitted having a confrontation with his neighbor but said it arose when an unknown male came onto his mother's property and dug up something from the dirt. He denied threatening anyone's life. He made several spontaneous comments about unknown persons approaching the windows of his home and attempting to look in. He could not explain why he had not reported these incidents to police. He showed police several cameras he had set up in the house pointing outward toward the driveway, but when police asked to see footage from them he said that it was digital and went to a laptop to which he did not have access.

The neighbor told police that as her gardener had arrived at her home that day, defendant had run up to him and said, "I saw you run me off the road, and I have pictures of your car and license plate." She herself was present, and defendant repeatedly told her, "Come down here bitch and I will beat the shit out of you." She said he seemed enraged and also said, "I will kill you!" The neighbor said that she was extremely frightened of defendant because of many past incidents, including one in which he had brandished a gun at his mother. The gardener too reported feeling threatened. Officers spoke to defendant's mother, who said that about a week earlier he had told her, "I would burn the fucking house down with you and [*sic*; probably "in"] it." She also confirmed that about 12 years earlier, after the death of her husband (defendant's father), defendant had pointed a handgun at her. She told police that she believed her son was mentally unstable. She reported, as summarized in the probation report, "that he constantly believed that people were out walking in front of their residence at night when in fact nobody was there."

### B. Proceedings Below

An information was filed on May 21, 2012, charging defendant with two counts of issuing criminal threats. The first count names the neighbor as the victim; the second names defendant's mother.

On June 12, 2012, pursuant to plea agreement, defendant entered a plea of no contest to count 1. When interviewed by the probation officer in July, defendant asserted that the neighbor who called 911, and with whom he had been interacting for 30 years, was a heroin dealer, child molester, and child pornography vendor. He said she had men at her house at odd hours. He described an incident in which he saw two men, whom he later learned were some of his neighbor's many employees, delivering a large package of what he later learned was heroin. According to the probation report, defendant "said that he has infra red [*sic*] and night vision security cameras that have captured [the neighbor] and many of her male associates, hopping the fence from her backyard into his mother's back yard at night." He discovered that they were burying heroin in plastic boxes in his back yard, to be dug up and sold when needed. He described an occasion in which a female acquaintance, who was visiting with her 12-year old daughter, threatened to call police because they saw the neighbor and a man naked, masturbating and having sex while looking at the daughter. On another occasion, he reported, he saw the neighbor "videotaping a male with over-sized genitalia" while the latter masturbated in her garage with the door open.

Defendant apparently claimed to have made hours of surveillance footage available to police. When asked why he thought they had ignored it, he said they had been seduced by the neighbor. He had seen two of the three officers present at his arrest enter the neighbor's home in the middle of the night "and leave hours later 'satisfied.' " He also said that a detective engaged by him had discovered that the police department left the neighbor alone in exchange for her "handing over a quota of names on unrelated

3

criminal activities." He said that his mother's accounts of these matters were unreliable because she suffered from mild dementia, early Alzheimer's disease, and failing eyesight.

On the date set for receipt of the probation report, the court heard a motion by defendant to be relieved of his appointed counsel. During the hearing defendant exhibited marked confusion, stating among other things that he could not "even remember why I'm in here." He attributed this confusion to one or more strokes, for which he said he had been treated by the Veterans' Administration, but he also said that what he could "basically" remember of the underlying events was that "there was a person that tried to break into my house, and I confronted them in the front yard, and they wind up arresting me." He then opined that the charges against him were "based on a person that has a propensity to make fraudulent statements to the police, 50 times a day, for the last 30 years." When defendant seemed unable to focus on the court's inquiries into his complaints against counsel, his attorney explained that defendant had informed him that morning of a desire to withdraw his plea of June 12, and that counsel had responded that he saw no legal basis to do so. Defendant confirmed that he wanted to withdraw his plea, but when the court sought to ascertain his understanding of the consequences—and specifically that "all charges would be reinstated"—defendant said, "I'm not even sure what the charges mean." When asked again whether he wanted to withdraw his plea, he expressed uncertainty: "Well, I'm not sure what do [*sic*], because I'm not sure what the charges actually mean." Shortly thereafter he said, "I mean, why am I being charged with two felony strikes, when—when the person threatened me with a hypodermic needle, and he said he was going to stick me with it, and he was in my parents' yard trying to break into my parents' house. Why am I being charged with two felonies—two strikes, and the police didn't seem to care about that."

The court moved to other matters on its calendar in order to give defendant an opportunity to confer further with counsel. When the matter reconvened counsel

4

indicated that defendant still wished to withdraw his plea. Counsel inferred that this request must rest on ineffective assistance of counsel since "[t]hat's about the only basis" that he could see for the request. The court asked defendant if he wanted to "withdraw your plea of no contest in this case and essentially start over." Defendant replied that he did not understand what the court meant by "start over." The court said the matter would be back to where it was before he entered the plea, and would be set for trial. Defendant asked whether he would be allowed to confront his accusers, then whether he would be entitled to choose whom to subpoena. The court assured him he could "subpoena any witnesses that are appropriate for the case in your defense." Defendant declared his incomprehension "how someone can make up these crazy, bizarre—first they said that I was—," whereupon the court interrupted that the hearing was not for "go[ing] into the facts" of the case. Defendant then said, "Well, can't I just press charges on them right now while I'm here?" The court said he could not. Shortly thereafter the court again asked defendant to express any concerns he had about defense counsel's actions or failures to act. Defendant replied, "Well, he failed to bring up the fact that this person calls the police 50 times day, every day. Even when I've been locked up, she's still calling the police and saying all kinds of bizarre things. How can I be there when I'm locked up in jail? She said I was a drug fiend. When he first—said you're a jerk. I said, 'here, take my blood.' " This was followed by a narrative that began plausibly but then descended into the bizarre.[1] The court asked whether he meant to convey that his

---

[1] "THE DEFENDANT TABAYOYON: I'm telling you what he's[, i.e., counsel has] tried to explain to me. Then he—then, I said, where are you getting all of this information from? He said, according to your neighbor. I said—your neighbor says you got a criminal record. I have no criminal record. The neighbor says you got mental problems. I don't really think I got any mental problems, 'cause the VA did a psychiatric evaluation for my truck driver's license. Then, he says, your neighbor says you're a dope fiend. I said, well, how would she know if I'm a dope fiend? Here, here's my arm. Take the blood. How is it this person can say all these crazy, bizarre things, and here I'm getting charged with two felony counts, two strikes, and no one—no one has even

5

attorney had not adequately investigated the facts of the case, and defendant answered yes. He also affirmed that he felt counsel had not adequately secured the medical care defendant required.

The court then asked counsel to recount his activities in the case, which he did. The court asked if counsel wished to add anything with respect to defendant's "essentially, *Marsden* motion." Counsel stated that he believed defendant had understood the charges and the consequences when he entered his plea, and that the present motion was a case of "buyer's remorse." After counsel summarized his professional experience, the court asked defendant if he wanted to "respond or add additional information," triggering another narrative that began with a list of aliases attributed to defendant—perhaps in the probation report—and again straying into the outlandish.[2]

---

bothered to check on any of the things that she said were credible? And they arrest me when her and her other weirdo friends—I mean, when I say 'weirdo,' I mean, really, they're bizarre—were trying break into my parents' house, and when I confronted them, I didn't even say—I said, what are you doing? And the guy pulls out the hypodermic needle and threatens to stick me with that. And then—and then—and then, the police comes up and arrests me? And when I tried to explain that to 'em, they told me—

"THE COURT: Okay.

"THE DEFENDANT TABAYOYON: —they told me I was a homophobic, fascist, radical Christian.

"THE COURT: All right. Mr. Tabayoyon—

"THE DEFENDANT TABAYOYON: That's what the police officer told me."

[2] "THE DEFENDANT TABAYOYON: Yeah, I do. I don't—I don't have any aka's. Why does this paper say I have all of these aliases on here? I've never been arrested. I don't know who Darryl James is or Darryl Lempke. I never used that name. And the only—and the preliminary hearing, when my mom was here, she didn't even recognize her own son. She was only 10 feet away. She couldn't recognize me, and her own statement was that she never even called the police. She never even said that I threatened her, at all. She's talking about the water heater, when I replaced the hose that

6

The court denied that motion. The court suspended proceedings under Penal Code section 1368 and referred defendant for an evaluation of his competence to stand trial. On August 2, 2012, the court found defendant not competent and referred him to a conditional release program for a "written recommendation as to whether the Defendant should be required to undergo outpatient treatment or committed to a state hospital or to any other treatment facility. (Penal Code 1368-1371)." On August 23, 2012, the court found defendant not suitable for outpatient treatment and, after making additional findings, ordered him placed in the trial competency program with directions that he could be involuntarily medicated. Defendant appealed from that order.

In this court defendant has requested judicial notice of superior court filings reflecting events subsequent to his taking the present appeal. We deferred a ruling on that request, but now grant it because these subsequent events are clearly relevant to the

---

was leaking, and that was—the only thing I ever said is if I don't fix the water heater, it will burn down the house. That's what I say. I don't know how [the reporting neighbor] would know that. And why is it that this—this woman can, you know, do all these bizarre things, and I'm—you know, so if the first count—she's called the police so many times over the past years, especially the last year, all these—you know, I've been pulled over by the police. The police says, we've got to report your car stolen. I'm said, this is my car. I'm driving it. It's registered and insured to me. How can—how can—I didn't report it stolen. I got pulled over 10 times, and how come—finally, I said, well, I want to see—you know, don't they record the dispatch when they get those calls? How can this person—every time I drive my car, I get pulled over. And the dispatch says, well, we've got to report this car was stolen. It's my car. It's registered, it's insured to me. I can't drive my own car? And then, when I asked about, you know—

"THE COURT: Okay. Sir, I'm going to, again—

"THE DEFENDANT TABAYOYON: Well, to get to the point, the harassment has gotten so bad, now that she comes with up with this felony stuff.

"THE COURT: Sir. Mr. Tabayoyon.

"THE DEFENDANT TABAYOYON: I didn't threaten anybody."

7

question of mootness. Thus it appears that on November 20, 2012, the court found that defendant was competent to stand trial based upon a certification of competency issued by the director of a state hospital a week earlier. On December 6, 2012, the court conducted a hearing either to proceed with defendant's sentencing or to entertain a motion to withdraw his plea. According to the minutes, defense counsel told the court that defendant withdrew any motion to set aside his plea. The court suspended imposition of sentence and placed defendant on probation. Among the terms of probation was a requirement that he "[t]ake all medications as prescribed."

## DISCUSSION

Defendant challenges the trial court's order authorizing the involuntary administration of medication on five grounds: (1) the court purported to authorize involuntary medication on multiple grounds, including that such medication was necessary to restore him to competence, but the statute authorizing involuntary medication on that ground specifies that no other ground for such an order must exist (Pen. Code, § 1370, subd. (a)(2)(B)(ii)); (2) in any event the evidence was insufficient to sustain an order for involuntary medication to restore competence (Pen. Code, § 1370, subd. (a)(2)(B)(i)(III); (3) insofar as the order for involuntary medication was predicated on defendant's posing a danger to others, it was not supported by a substantiated finding that he in fact posed such a danger (Pen. Code, § 1370, subd. (a)(2)(B)(i)(II)) or that medication was in his medical interest (*Washington v. Harper* (1990) 494 U.S. 210, 227); (4) the evidence was insufficient to sustain an order for involuntary medication on the ground that defendant lacked capacity to make his own medical decisions (Pen. Code, § 1370, subd. (a)(2)(B)(i)(I)); and (5) the court failed to engage in the medication-specific analysis which has been held necessary to justify the infringement on liberty occasioned by involuntary medication (*Carter v. Superior Court* (2006) 141 Cal.App.4th 992, 1000; *United States v. Riviera-Guerrero* (9th Cir. 2005) 426 F.3d 1130, 1137-1138).

8

Respondent contends that (1) defendant has failed to preserve these claims of error because he did not object to the order on these grounds in the trial court; (2) the claims are moot because the matter has proceeded to a final judgment and this court can grant no effective relief; and (3) the trial court's order for involuntary medication can be sustained on the ground that defendant presented a substantial danger to others, a finding for which the record contains substantial evidentiary support. We conclude that the appeal is moot and that no exception compels us to address it on the merits rather than follow the general rule requiring dismissal.

"Ordinarily, a moot appeal will be dismissed." (*City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 479, citing 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 642, p. 669.) This is because generally, courts will not decide a case unless it involves "a present, concrete, and genuine dispute as to which the court can grant effective relief." (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1489.) Thus an order imposing an involuntary commitment ordinarily becomes subject to dismissal as moot when the order ceases by its terms to restrain the subject's liberty. (See, e.g., *People v. Hurtado* (2002) 28 Cal.4th 1179, 1186 [case "became moot when defendant's 1996 commitment expired"; court nonetheless addressed recurring issues on merits].)

Defendant argues that the case is not truly moot because the order he challenges may have had, or may yet have, collateral consequences from which he continues to need judicial protection. He asserts that the case is "nearly identical" to *People v. Succop* (1967) 67 Cal.2d 785 (*Succop*), where the defendant challenged proceedings leading to his temporary commitment for observation as a mentally disordered sex offender. The state argued that his challenge was moot because the observation period had ended with a finding that he was a sex offender not amenable to treatment, whereupon he had been committed to prison. Not surprisingly, the court declined to find his challenges to the temporary commitment order moot; had his statutory rights been honored, the court

9

wrote, "the trial court conceivably might have found that there was not probable cause for believing him to be a mentally disordered sex offender. Such a finding would be relevant to the question whether probation should be granted and to the matter of parole if a prison sentence was imposed." (*Id.* at p. 790.)

Far from closely resembling this case, the relevant circumstances in *Succop* differed dramatically from those here. The defendant in *Succop* had appealed from the trial court's judgment of conviction; the claimed errors could be remedied, and were remedied, by reversing the judgment in relevant part, vacating the defective order for temporary commitment, and remanding for further proceedings as if that order had not been made.[3] Defendant, in contrast, has not appealed from the judgment and does not seek further proceedings in the trial court.[4] He asks only that we "reverse the trial court's

[3] "The order committing defendant to Atascadero State Hospital for a period not to exceed 90 days and the order denying probation are vacated. The judgment of conviction is reversed insofar as it commits defendant directly to imprisonment in a state prison and is otherwise affirmed. The defendant is ordered returned to the superior court for a hearing to determine whether there is sufficient cause to believe him to be a mentally disordered sex offender and for such further proceedings as the trial court deems proper . . . ." (*Succop*, *supra*, 67 Cal.2d at p. 790.)

[4] Conceivably, if we found defendant's claims of error to be sound, and if he sought reversal and remand, we might be able to set aside the judgment and order further proceedings on whether he could be involuntarily medicated. Of course, this hypothesis immediately collides with the conundrum that, so far as the record shows, he is now competent, such that there would be no basis for a competency hearing, let alone for consideration of involuntary medication. If that were confirmed, the judgment having been reversed, all the court could do would be to set the matter for trial, whereupon we would expect defendant to enter the same plea, and the court to enter the same judgment, we had set aside. We fail to see how such proceedings could advance any interest of defendant's.

Of course it is possible that, pending remand, defendant might stop taking his medication, or might otherwise revert to a state in which he was not competent to defend himself. In that case, if we set aside the judgment and directed further proceedings, the trial court would presumably conduct a new competency hearing in conformity with statutory requirements. It might then again conclude—this time unimpeachably—that

10

order and issue a written opinion instructing the trial court to adhere to the provisions of Penal Code section 1370 in all future cases."

We fail to see what interest of defendant's would be "protected" by reversing the order authorizing involuntary medication. Defendant states that had the trial court here "comported with the statutory and due process requirements for issuing an involuntary medication order, the court may have reached a different finding, and [that] may in turn have impacted the court's subsequent sentencing decisions." But this is a description of how *past events* were affected by the claimed errors. The question of mootness is chiefly concerned with what purpose will be served, or what concrete goal accomplished, by granting an appellate remedy. The error of which defendant complains has long since passed beyond correction. That water has flowed under the bridge, down the river, and out to sea.[5]

---

involuntary medication was appropriate; that scenario, too, would presumably lead to a judgment identical to the one we had (hypothetically) set aside.

The only way we see a different outcome is if the court concluded, at a new competency hearing, that defendant could *not* be involuntarily medicated in conformity with the statute. In that case he might remain confined for three years while attempts were made to restore his competency by other means. (Pen. Code, § 1370, subd. (c)(1); see *id*., §§ 422, subd. (a), 18, subd. (a).) We fail to see how this possibility could defeat an appearance of mootness, even if defendant sought such a disposition—which, we emphasize, he does not.

[5] In rejecting the claim of mootness, the court in *Succop* also alluded to the stigmatizing effect of the order there at issue, declaring the defendant "entitled to the opportunity to clear his name of the adjudication that he is a probable mentally disordered sex offender." (*Succop*, *supra*, 67 Cal.2d at p. 790.) Other courts have recognized that the "stigma" inflicted by some commitment orders may require consideration of their soundness on the merits even where an order has become technically moot. (See *In re Michael D.* (1977) 70 Cal.App.3d 522, 524, fn. 1; *Conservatorship of Johnson* (1991) 235 Cal.App.3d 693, 696, fn. 1.) Defendant does not invoke this rule, however, and we do not find it applicable. His appellate challenge is not directed to the finding that he was incompetent to stand trial, and that he be confined accordingly, but to the further order subjecting him to involuntary medication. To the extent the proceedings may have

11

Nor do we see how we could afford an effective remedy by issuing "a written opinion instructing the trial court to adhere to the provisions of Penal Code section 1370 in all future cases." That court is already under a solemn obligation to comply with applicable statutes; any failure to do so must ordinarily be attributed to oversight. We might view the case differently if the requirements now cited by defendant had been squarely asserted below, and the trial court had *refused* to honor them. But so far as this record shows, these requirements were simply overlooked by the trial court and the parties. A further directive from this court not to overlook them in the future would accomplish little if anything. Indeed, a judicial mandate buried in the casebooks is more easily overlooked than one set forth in a governing statute. So far as this record shows, the remedy for threatened future infractions is simply to bring the statutory requirements to the trial court's attention.

Similar considerations defeat defendant's attempt to bring this case within an exception to the rule of mootness that arises where an issue in the present appeal is likely to come up again between the same parties. (See *Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 479.) Defendant asserts that this rule applies here because he is on currently on probation, he may be charged with a probation violation, he may again be found incompetent, and "[w]ithout intervention from the Court of Appeal, the Superior Court is likely to make the same erroneous medication order." To borrow a popular phrase, that's a lot of if's. But more tellingly, we see no reason to believe that—assuming the court erred as claimed—it would repeat that error in a subsequent proceeding. As respondent notes in arguing that the claim has not been preserved for appeal, none of the statutory and constitutional

attached any stigma, it would seem largely attributable to the finding of incompetency; the further order for involuntary medication might even be understood to *lessen* the stigma by signifying that the condition causing his mental incompetence was treatable.

12

requirements here asserted by defendant were brought to the trial court's attention. We will not assume that, if they *had* been brought to the court's attention, the court would have ignored them and made the same order. Insofar as defendant relies on claimed insufficiencies in the evidence before the court, there is no reason to suppose that the record at a subsequent hearing would not be suitably augmented. In short, there is no reason to expect that the court would make the same order, or that any order it might make would suffer from the same deficiencies identified here.

Finally, defendant invokes the rule that, technical mootness notwithstanding, an appellate court will consider issues of public importance that are " ' "capable of repetition, yet evading review." ' " (*Press-Enterprise Co. v. Superior Court* (1986) 478 U.S. 1, 6.) We agree that cases of this kind will tend to evade review, at least by direct appeal, because of the limited duration of many, if not most, commitments to restore competence. However we are unable to conclude that the case presents an important issue that is likely to recur. All of the cases cited by defendant presented questions of obvious general application to multiple persons and cases. (See *id*. at p. 3 ["whether [a newspaper] has a First Amendment right of access to the transcript of a preliminary hearing growing out of a criminal prosecution"]; *In re Kieshia E.* (1993) 6 Cal.4th 68, 74 ["whether a child abuser may ever intervene as the victim's de facto parent in proceedings which arose from the abuse"]; *Abbott Ford, Inc. v. Superior Court* (1987) 43 Cal.3d 858, 863, fn. omitted ["whether a 'sliding scale recovery agreement,' . . . in a personal injury action, represents a 'good faith' settlement . . .]; *John A. v. San Bernardino City Unified School Dist.* (1982) 33 Cal.3d 301, 307 ["[w]hat process is due a student facing expulsion from a public school"].)

Defendant identifies, and we have detected, no comparably broad "issue of public importance" here. He contends that "the trial court's abject failure to adhere to the statutory and due process requirements involved in issuing such an order are of the

13

utmost importance to future defendants in Monterey County." But accepting arguendo that the case in fact presents such an "abject failure," there is no reason to suppose that the error is likely to be repeated in future cases. Accordingly, the case is moot, and no adequate reason appears to withhold the usual consequence of dismissal.

**DISPOSITION**

The appeal is dismissed.

_____
                    RUSHING, P.J.

WE CONCUR:

_____
          PREMO, J.

_____
          ELIA, J.

14